[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-14146

_____

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 30, 2003
THOMAS K. KAHN
CLERK**

D.C. Docket No. 00-00100-CV-1


REVEREND DANIEL KING,
E. RONALD GARNETT, and
SHIRLEY FENCL,

                                        Plaintiffs-Appellants,


        versus


RICHMOND COUNTY, GEORGIA and
ELAINE JOHNSON, in her individual
capacity and in her official capacity as
Clerk of the Superior Court of Richmond
County, Georgia,

                                        Defendants-Appellees.



_____

Appeal from the United States District Court for the
Southern District of Georgia

_____

**(May 30, 2003)**

Before EDMONDSON, Chief Judge, and KRAVITCH and GIBSON[*], Circuit Judges.

KRAVITCH, Circuit Judge:

The question presented is whether the use of a court clerk's seal violates the Establishment Clause of the First Amendment when the seal contains an outline of the Ten Commandments, a sword, and the name of the court and is used solely to authenticate documents. We conclude that it does not.

## I.    BACKGROUND

Since 1852, a Georgia statute has required clerks of the state superior courts to have a "substantial seal of office" with the name of the county and court inscribed thereon.[1] In conformance with the statute, the Clerk of the Superior Court of Richmond County has maintained an official seal (the "Seal") for more than 130 years. Records found in the Richmond County clerk's office indicate that the Seal has been used on documents at least since 1872.

---

[*] Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

[1] Acts of the General Assembly of the State of Georgia, 1851–1852, No. 46, Title VII, Section 1 & 2, approved January 12, 1852 (making it the duty of clerks, with failure punishable as a misdemeanor, "to buy a good and Substantial Seal of Office"); O.C.G.A. § 15-6-61(a)(7) (2001) (requiring the clerk of the superior court "[t]o procure a substantial seal of office with the name of the court and the county inscribed thereon").

The Seal is circular, with the words "SUPERIOR COURT RICHMOND COUNTY, GA" inscribed around the perimeter. The center of the Seal contains a depiction of a hilt and tip of a sword, the center of which is overlaid by two rectangular tablets with rounded tops. Roman numerals I though V are listed vertically on the left tablet; the right lists numerals VI to X. The Seal is placed on documents in one of three ways: with ink from a rubber stamp, by embossment into paper, or by embossment into a gold seal on paper. The ink-stamped version of the seal is approximately one-and-a-half inches in diameter, with the center portion depicting the tablets measuring approximately one inch. The embossed version is smaller, approximately one-and-a-fourth inches in diameter, with the center portion measuring less than three-fourths of an inch.

The Seal's only function is to authenticate legal documents. In one of the forms described above, the Seal is affixed to all certified copies of court documents and real-estate records, witness subpoenas, certifications of juror service, notary certificates of appointment, and attorney licenses. Approximately 24,000 documents bore the Seal in 1999. The Seal does not appear on the office of the clerk's letterhead or on its website, nor is it displayed in the clerk's office, in the courtroom, or anywhere else in the

3

Richmond County Courthouse. The office of the clerk's letterhead and envelopes bear the seal of the state of Georgia instead.

Richmond County displays another object relevant to this case. A statue of *Justice,* entitled "Miss Justice," stands in the parking lot of the city-county municipal building and courthouse.[2] The statue depicts *Justice* as a woman holding a sword in her right hand and the scales of justice in her left.

Appellants Reverend Daniel King, E. Ronald Garnett, and Shirley Fencl filed suit in federal district court under 42 U.S.C. § 1983, contending that the Seal violates the Establishment Clause of the First Amendment. Appellants sought injunctive and declaratory relief as well as nominal damages against Richmond County and Elaine Johnson, Clerk of the Superior Court, in both her individual and official capacities. According to the complaint, the Seal "prominently displays the Ten Commandments, a sacred text in the Judeo-Christian religious traditions," in violation of the Establishment Clause and Article I, section II, paragraph VII of the Georgia Constitution. In response, the Appellees conceded that the pictograph in the center of the Seal resembles

---

[2] The statue, dating from 1820, was originally placed on the cupola of the Augusta City Hall, which became the Richmond County Courthouse. When the previous courthouse was demolished, the county restored the statue and in 1962 placed it at its current location.

depictions of the Ten Commandments,[3] but argued that the use of the Seal is not unconstitutional under any of the Supreme Court's Establishment Clause tests.

After a summary bench trial, the District Court concluded that although the tablets depicted on the Seal represented the Ten Commandments, and that a reasonable observer could view them as such, there was no Establishment Clause violation. The District Court found, and both parties agreed, that the Seal had been in use for more than 130 years but that there was no evidence of the purpose for the Seal's design or when it was adopted by the clerk of the superior court.

Employing the Supreme Court's test in Lemon v. Kurtzman, 403 U.S. 602 (1971), the District Court examined the facts to determine (1) whether the Seal had a secular purpose, (2) whether its primary effect was to advance religion, and (3) whether it fostered excessive entanglement between government and religion. On the first of these questions, the District Court found that the purpose of the Seal's design was "lost in the mists of history" but that pictographs of the Ten Commandments represented "both religious virtue and the rule of law." Second, the court held that the Seal's primary effect was

---

[3] Appellees' br. at 4. Appellees observe that the "figure has a sword, which appears to either pierce it or go behind it" and that to their knowledge "there is no representation of the Ten Commandments with a sword such as in the Superior Court seal . . . ." Id.

not to advance religion. The court reasoned that the outline of the Ten Commandments was distinguishable from cases in which the text was displayed, indicating that a depiction without the text "would not lead a reasonable observer to conclude that religion was endorsed." The court concluded that, given the Ten Commandments' "role in the secular development of our society" and legal system, a reasonable observer would view the Seal as "conveying the image of a widely recognized legal code used merely to notify the reader that the stamped documents are court documents." The court emphasized that the use of the Seal was limited to the authentication of documents and was inconspicuous when compared to the governmental displays described in other cases. Third, the court found that the use of the Seal had not caused an excessive entanglement between government and religion. Finally, it held that the claims under Georgia's constitution were without merit.

On appeal, Appellants argue that the District Court erred in finding that the Seal did not violate the Establishment Clause because (1) the Seal has a religious purpose and (2) the use of the Seal has the primary effect of endorsing religion. Appellants do not challenge the District Court's conclusions as to the lack of excessive entanglement or their claims under the Georgia Constitution.

II.     STANDARD OF REVIEW

We review the District Court's factual findings for clear error and review de novo its legal conclusions.  See ACLU of Ga. v. Rabun County Chamber of Commerce, Inc., 698 F.2d 1098, 1110 (11th Cir. 1983) (per curiam).

III.    ANALYSIS

The issue presented is whether the use of the Seal violates the Establishment Clause of the First Amendment.  The Establishment Clause prohibits Congress from making any law "respecting the establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const., Amend. I. The prohibition against the establishment of religion applies to the states through the Fourteenth Amendment.  See Cantwell v. Connecticut, 310 U.S. 296 (1940).

In religious-symbols cases, the Supreme Court has applied the analysis outlined in Lemon v. Kurtzman, 403 U.S. 602 (1971).  See, e.g., County of Allegheny v. ACLU, Greater Pittsburgh Chapter, 492 U.S. 573, 592 (1989); Lynch v. Donnelly, 465 U.S. 668, 679 (1984); Stone v. Graham, 449 U.S. 39, 40–41 (1980) (per curiam).  Under the Lemon analysis, a governmental practice violates the Establishment Clause if it does not have a secular purpose, if its

primary effect is to advance or inhibit religion, or if it fosters excessive government entanglement with religion. Lynch, 465 U.S. at 679.

Despite the Supreme Court's reliance on these three "tests," it has emphasized that there is no bright-line rule for evaluating Establishment Clause challenges and that each challenge calls for line-drawing based on a fact-specific, case-by-case analysis. Id.; see also County of Allegheny, 492 U.S. at 592. In recent years, the Court has "paid particularly close attention" to whether the challenged governmental practice has either "the purpose or effect of 'endorsing religion.'" County of Allegheny, 492 U.S. at 592. Even though some Justices and commentators have strongly criticized Lemon,[4] both the Supreme Court and this circuit continue to use Lemon's three-pronged analysis. See id.; Adler v. Duval County Sch. Bd., 206 F.3d 1070, 1075 (11th Cir. 2000) (en banc), *vacated by* 531 U.S. 801, *opinion and judgment reinstated by* 250 F.3d 1330 (11th Cir. 2001); Rabun County, 698 F.2d at 1098.

Here, Appellants argue that the use of the Seal violates the purpose and effect prongs of the Lemon analysis; they do not contend that use of the Seal

---

[4] See, e.g., Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 397 (1993) (Scalia, J., concurring); County of Allegheny v. ACLU, Greater Pittsburgh Chapter, 492 U.S. 573, 660 (1989) (Kennedy, J., concurring in part and dissenting in part); Jesse H. Choper, *The Establishment Clause and Aid to Parochial Schools—An Update*, 75 CAL. L. REV. 5, 6–8 (1987); William P. Marshall, *"We Know It When We See It": The Supreme Court and Establishment*, 59 S. CAL. L. REV. 495, 496–98 (1986); Michael W. McConnell, *Accommodation of Religion*, 1985 S. CT. REV. 1, 1–3, 6.

implicates excessive government entanglement with religion. Accordingly, for Appellants to prevail, they must show that, given the particular facts of this case, the use of the Seal violates either the purpose test or the effect test of Lemon.

*A.   Purpose Prong*

"Under the *Lemon* analysis, a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose." County of Allegheny, 492 U.S. at 592. According to Appellants, our analysis of this prong could begin and end with Stone v. Graham, 449 U.S. 39 (1980) (per curiam). Although informative, Stone does not foreclose our inquiry.

In Stone, the Supreme Court invalidated a Kentucky statute that required the posting of the text of the Ten Commandments on the wall of every public-school classroom. 449 U.S. at 41. Describing the Ten Commandments as an "undeniably sacred text," the Court found that the "pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature." Id. Stone, however, does not stand for the proposition that there can never be a permissible secular use of the Ten Commandments. The opinion

distinguishes Kentucky's posting the text of the Ten Commandments on schoolroom walls from constitutionally appropriate uses of the Commandments and other parts of the Bible in a public-school curriculum, such as "an appropriate study of history, civilization, ethics, comparative religion, or the like." Id. at 42. Accordingly, because governmental use of the Ten Commandments is not a per se violation of the purpose prong, we must continue our inquiry and determine whether the Seal's depiction of the Ten Commandments and sword has a secular purpose.

Lemon's first prong requires us to ascertain the purpose of the relevant governmental practice. Appellees argue that the first prong of Lemon is satisfied because state law requires the superior court's clerk to have a seal. See O.C.G.A. § 15-6-61(a)(7) (2001). Appellees' assertion, however, misperceives the true inquiry. Under the purpose test, the relevant inquiry is not whether there was a secular purpose for creating and using a legal seal; it is to determine the government's purpose for adopting this particular seal, one that depicts the Ten Commandments and sword.

As stated previously, the District Court found, and both parties concede, that there was no evidence regarding the original purpose for adopting the design of the Seal and that the Seal has existed in its current form since at least

1872. The District Court hypothesized that, because approximately thirty-five percent of Georgia's population in 1872 was illiterate, the then-clerk of the court may have chosen the Ten Commandments and the sword as pictographs that were easily recognizable symbols of the law. Additionally, the District Court found that a pictograph of the Ten Commandments was, in addition to being a religious symbol, a secular symbol for the rule of law. Nevertheless, the court admitted that the purpose for adopting this particular seal design has been "lost in the mists of history."

This case, therefore, presents the issue of how to apply the purpose test when there is no evidence of the government's intent for adopting a particular practice. No decision from the Supreme Court or the Eleventh Circuit addresses this issue directly, but precedents do give some guidance. In Rabun County we stated, "At the core of the Establishment Clause is the requirement that a government justify in secular terms its purpose for engaging in activities which may appear to endorse the beliefs of a particular religion." Rabun County, 698 F.2d at 1110. Hence, it seems that the government always has the obligation to propose a secular justification for the challenged practice. This does not mean, however, that the government fails the purpose prong in cases in

which there is no available evidence of the original intent for adopting a practice.

When there is no evidence of the original purpose for adopting a practice, the government may propose possible secular justifications for the challenged practice. In Mueller v. Allen, 463 U.S. 388 (1983), the Supreme Court explained that it was reluctant to attribute an unconstitutional motive to the government where a "plausible secular purpose" may be discerned from the statute. Id. at 394–95; see also Adler, 206 F.3d at 1075. The fact that the government articulates a possible legitimate secular purpose for the practice, however, does not mean that it has satisfied the purpose prong. Although courts should be "deferential to a State's articulation of a secular purpose," Edwards v. Aguillard, 482 U.S. 578, 586 (1987), the party challenging the governmental practice can prevail under the purpose prong if it can show that the government's articulated secular purpose is insincere or a "sham." Id. at 587; cf. Stone, 449 U.S. at 41 (explaining that an "avowed" secular purpose that is "self-serving" is "not sufficient to avoid conflict with the First Amendment"). Therefore, once the government proposes a possible secular purpose for the challenged practice, the party challenging the practice has the opportunity to rebut the stated secular purpose with evidence showing that the articulated

purpose is insincere or a sham. See id.; cf. Lynch, 465 U.S. at 679 ("The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded that there was no question that the statute or activity was motivated wholly by religious considerations.").

Applying this approach to the present case, Appellees have articulated a plausible secular purpose for the design of the Seal. They claim that, in the context of authenticating legal documents, using a pictograph of the Ten Commandments intertwined with the sword helps viewers recognize the legal validity of documents.[5] The District Court's findings support Appellees' proposed justification. The court found that during the 1870s the outline of the Ten Commandments presumably would have enabled illiterate citizens to recognize the legal validity of documents displaying the Seal. Appellees' proffered secular justification satisfies the initial burden under the purpose prong. Because there is no evidence of the purpose in adopting the Seal's design and because Appellants have not shown that the articulated secular purpose is implausible, we conclude that Appellees have satisfied the first prong of the Lemon test.

---

[5] Appellees' br. at 19–21.

Of course, this analysis applies only when there is no evidence of governmental intent for adopting a practice. When evidence shows that endorsement or promotion of religion was a primary purpose for the challenged practice, the inquiry ends, as the practice violates the Establishment Clause. See Edwards, 482 U.S. at 585 (holding that Louisiana's Balanced Treatment for Creation-Science and Evolution-Science in Public School Instruction Act was unconstitutional because the act's primary purpose was the promotion of a particular religious belief); Wallace v. Jaffree, 472 U.S. 38, 57–59 (1985) (holding that Alabama's moment-of-silence statute was unconstitutional because legislative history showed that the statute's primary purpose was to promote prayer and religion).

## B.    *Effect Prong*

The second inquiry of the Lemon test, the effect prong, is whether the "principal or primary effect" of a challenged law or conduct is "to advance or inhibit religion." Lynch, 465 U.S. at 679. The Court has explained the effect prong to mean that, even when evidence of religious purpose is lacking, the Establishment Clause prohibits the government from "appearing to take a position on questions of religious belief or from 'making adherence to a religion

14

relevant in any way to a person's standing in the political community.'" County of Allegheny, 492 U.S. at 594 (quoting Lynch, 465 U.S. at 687 (O'Connor, J., concurring)). Two of the Court's most recent religious-symbols cases give guidance in applying Lemon's effect prong.

### 1. *Prior Precedent*

*a.* Lynch v. Donnelly

In Lynch v. Donnelly, 465 U.S. 668 (1984), the Supreme Court held that the City of Pawtucket, Rhode Island did not violate the Establishment Clause when it displayed a crèche as part of its annual Christmas display. In addition to the crèche, which is a representation of the Nativity scene, the display included a Santa Clause house, reindeer, candy-striped poles, a Christmas tree, carolers, hundreds of colored lights, and a large banner with the words "Seasons Greetings." Id. at 671.

Rejecting a strict wall-of-separation theory of the Establishment Clause, the Court cited numerous examples of "the Government's acknowledgment of our religious heritage and governmental sponsorship of that heritage," id. at 677, to demonstrate that the Constitution does not prevent government from ever using religious symbols or references to divinity. See id. at 673–78. The

15

Court explained, "In every Establishment Clause case, we must reconcile the inescapable tension between the objective of preventing unnecessary intrusion of either the church or the state upon the other, and the reality that, as the Court has so often noted, total separation of the two is not possible." Id. at 672. The Court continued, "In each case, the inquiry calls for line drawing; no fixed, *per se* rule can be framed." Id. at 678.

Repeating the three "useful" "inquiries" of the Lemon test, the Court emphasized that the constitutionality of the government's use of a predominantly religious symbol depends on the context in which it appears. Id. at 679. Hence, the Court instructed that in deciding the constitutionality of Pawtucket's display, the "focus of our inquiry must be on the crèche *in the context* of the Christmas season." Id. (emphasis added). Furthermore, in reviewing precedent, the Court explained that the state practices in Stone v. Graham, 449 U.S. 39 (1980) (per curiam), and Abington School District v. Schempp, 374 U.S. 203 (1963) (Bible study in public schools), were impermissible because the government did not use the religious writings in a context sufficiently related to a secular purpose. See Lynch, 465 U.S. at 679.

Applying these principles, the Court held that the district court erred when it found that the crèche display served no secular purpose. Celebrating

16

the Christmas holiday season and depicting the origins of that holiday, the Court explained, were "legitimate secular purposes." Id. at 681. Furthermore, the Court applied Lemon's effect test and concluded that the use of the nativity scene, at least in the context of a Christmas display that included both religious and nonreligious symbols, did not have the primary effect of advancing or endorsing religion. See id. at 683, 685–86.

In a concurring opinion that has influenced subsequent religious-symbol cases, Justice O'Connor framed the central issue in the case as "whether Pawtucket has endorsed Christianity by its display of the crèche." Id. at 690 (O'Connor, J., concurring). "To answer that question, we must examine both what Pawtucket intended to communicate in displaying the crèche and what message the City's display actually conveyed. The purpose and effect prongs of the Lemon test represent these two aspects of the meaning of the City's action." Id. (O'Connor, J., concurring). According to the concurrence, "[t]he meaning of a statement to its audience depends both on the intention of the speaker and on the 'objective' meaning of the statement in the community." Id. (O'Connor, J., concurring). Thus, the test has both a subjective and an objective component. A governmental statement or action fails Lemon's purpose prong if, despite the existence of a stated secular purpose, the

17

"government intends to convey a message of endorsement or disapproval of religion." Id. at 691 (O'Connor, J., concurring). The effect prong asks whether, irrespective of government's actual purposes, the practice under review in fact would convey a message of endorsement or disapproval to an informed, reasonable observer. Id. at 690 (O'Connor, J., concurring).

In applying the effect prong, Justice O'Connor reasoned that "[a]lthough the religious and indeed sectarian significance of the crèche . . . [was] not neutralized by the setting, the overall holiday setting change[d] what viewers [would] fairly understand to be the purpose of the display . . . ." Id. at 692 (O'Connor, J., concurring). "Every government practice," she stated, "must be judged *in its unique circumstances and context* to determine whether it constitutes an endorsement or disapproval of religion." Id. at 694 (O'Connor, J., concurring) (emphasis added). Because governmental celebrations of the holiday season are so common, Justice O'Connor concluded that a reasonable person would not perceive a crèche that is accompanied by purely secular symbols of the season to be a governmental endorsement of religion.

*b.* County of Allegheny v. American Civil Liberties Union

A more recent religious-symbol case is <u>County of Allegheny v. ACLU, Greater Pittsburgh Chapter</u>, 492 U.S. 573 (1989). That case involved two holiday displays located on public property. The first was a crèche displayed on the Grand Staircase of the county courthouse during the Christmas season. The crèche "include[d] figures of the infant Jesus, Mary, Joseph, farm animals, shepherds, and wise men, all placed in or before a wooden representation of a manger, which ha[d] at its crest an angel bearing a banner that proclaim[ed] 'Gloria in Excelsis Deo!'" <u>Id.</u> at 580. A fence and a backdrop of greenery and poinsettias surrounded the Nativity scene, and a sign indicated the name of the donor, but no other secular symbols or decorations accompanied the display. "Altogether, the crèche, the fence, the poinsettias, and the trees occupied a substantial amount of space on the Grand Staircase," which was "the 'main,' 'most beautiful,' and 'most public' part of the courthouse . . . ." <u>Id.</u> at 579–80.

The second holiday display was located at the entrance to the main office building for the city and county. The display contained an 18-foot-tall Chanukah menorah[6] standing next to a 45-foot-tall evergreen Christmas tree. A

_____

[6] "Menorah" is Hebrew for "candelabrum," <u>County of Allegheny</u>, 492 U.S. at 583 n.14 (quoting 11 <u>Encyclopaedia Judaica</u>, "Menorah," at 1356), and traditionally is used to celebrate Chanukah, a religious holiday. For a discussion of the Chanukah menorah and its history, see <u>id.</u> at 583–85.

19

sign referred to the display as a "Salute to Liberty." The ACLU argued that the use of the crèche and the menorah violated the Establishment Clause.

A splintered Court held that the crèche display violated the Establishment Clause but that the use of the menorah did not. Justice Kennedy, joined by Chief Justice Rehnquist and Justices White and Scalia, believed that both displays were constitutional; Justice Brennan, joined by Justices Marshall and Stevens, would have found both to be unconstitutional. Only Justices Blackmun and O'Connor believed that the menorah display was constitutional and that the crèche display was not, but, as they were the "swing votes" in the case, their view prevailed.

In holding the crèche display unconstitutional, the Court focused on the display's effect. The Court began its analysis by explaining that "[u]nder the Court's holding in *Lynch*, the effect of a crèche turns on its setting" and that, unlike the display in Lynch, the crèche in this case stood alone as "the single element of the display on the Grand Staircase." Id. at 598. "[N]othing in the context of the display detract[ed] from the crèche's religious message." Id. Furthermore, because the crèche sat on the Grand Staircase, which was "the 'main' and 'most beautiful part' of the building that is the seat of county government," the Court reasoned that "[n]o viewer could reasonably think that

20

it occupie[d] this location without the support and approval of government." Id. at 599. The Court explained that "by permitting the 'display of the crèche in this particular physical setting,' the county sends an unmistakable message that it supports and promotes the Christian praise to God that is the crèche's religious message." Id. at 600 (internal citation omitted). The Court concluded, "The display of the crèche *in this context*, therefore, must be permanently enjoined." Id. at 602 (emphasis added). In short, the Court assessed the crèche's "endorsement effect" by analyzing the display's overall context and the display's likely impact on reasonable viewers. Id. at 598–602.

As part of its discussion of the crèche display, the Court explicitly rejected the "proselytization" approach, which Justice Kennedy had proposed as an alternative to the Court's endorsement inquiry. Id. at 602. Furthermore, the Court declined Justice Kennedy's reading of Marsh v. Chambers, 463 U.S. 783 (1983), explaining that "history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed." Allegheny County, 492 U.S. at 603.

The Court did not agree on the reason for upholding the menorah display, so it issued only a judgment declaring that the menorah display was constitutional. Justices Blackmun and O'Connor, the swing votes, focused their

21

individual opinions on the importance of context when applying the effect prong, just as the Court had done in its opinion regarding the crèche display. See id. at 595–97, 613–21 (opinion of Blackmun, J.); id. at 624–27 (O'Connor, J., concurring).[7]

Supreme Court precedent in the most recent religious-symbols cases makes one thing clear: when applying Lemon's effect test, the constitutionality of the government's use of a predominantly religious symbol depends upon the context in which it appears. In religious-symbols cases, context is the

_____

[7] Relying on Justice O'Connor's Lynch concurrence, Justice Blackmun explained, "The effect of the display depends upon the message that the government's practice communicates: the question is 'what viewers may fairly understand to be the purpose of the display.'" Id. at 595 (opinion of Blackmun, J.). "That inquiry, of necessity, turns upon the context in which the contested object appears: '[A] typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content.'" Id. (opinion of Blackmun, J.) (quoting Lynch, 465 U.S. at 692 (O'Connor, J., concurring)). Explaining the result in Lynch, Justice Blackmun noted that "despite divergence in the bottom line, the five Justices in concurrence and dissent . . . agreed upon the relevant constitutional principles: the government's use of religious symbolism is unconstitutional if it has the effect of endorsing religious beliefs, and the effect of the government's use of religious symbolism depends upon its context." County of Allegheny, 492 U.S. at 597 (opinion of Blackmun, J.).

Applying these principles, Justice Blackmun recognized the menorah as a religious symbol, but concluded that "the menorah's message is not exclusively religious" and "has both religious and secular dimensions." Id. at 613–14 (opinion of Blackmun, J.). Given the menorah's "particular physical setting," which included a large Christmas tree and a sign saluting liberty, Justice Blackmun reasoned that "the city's overall display must be understood as conveying the city's secular recognition of different traditions for celebrating the winter-holiday season." Id. at 620 (opinion of Blackmun, J.).

Justice O'Connor wrote separately from Justice Blackmun on the effect-prong analysis and concluded that "[a] reasonable observer would . . . appreciate that the combined display is an effort to acknowledge the cultural diversity of our country and to convey tolerance of different choices in matters of religious belief or nonbelief by recognizing that the winter holiday season is celebrated in diverse ways by our citizens." Id. at 635 (O'Connor, J., concurring).

22

touchstone; we therefore must inquire whether observers would reasonably believe that the government's use of a predominantly religious symbol sends a message of governmental endorsement of religion. See Allegheny County, 492 U.S. at 598–600; Adler, 206 F.3d at 1101; Chabad-Lubavitch of Ga. v. Miller, 5 F.3d 1383, 1391 n.11 (11th Cir. 1993) (en banc). Courts must evaluate challenged governmental practices on a case-by-case basis, judging each practice in its unique circumstances and in its particular physical setting.

### 2. *Application of the Effect Prong*

Appellants argue that using a symbol of the Ten Commandments on the Seal violates the effect prong because it gives the appearance of governmental endorsement of religion. As the Supreme Court has recognized, the Ten Commandments are "undeniably a sacred text in the Jewish and Christian faiths . . . ." Stone, 449 U.S. at 41. In many contexts, governmental use of the text of the Ten Commandments would convey a message of endorsement and thereby violate the Establishment Clause. See id.

Yet, as the Supreme Court explained in Lynch, it is improper to "[f]ocus exclusively on the religious component of any activity," as doing so "would inevitably lead to its invalidation under the Establishment Clause." Lynch, 465

23

U.S. at 680. Indeed, the Court in Stone noted that, in the context of public education, the Ten Commandments "may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." Stone, 449 U.S. at 42. The issue under the effect prong in this case is whether, given the context in which the Seal is used and the Seal's overall appearance, the pictograph representing the Ten Commandments conveys a message of religious endorsement.

Although the Ten Commandments are a predominantly religious symbol, they also possess a secular dimension. As Stone pointed out, the first four Commandments concern an individual's relationship with God and "the religious duties of believers: worshiping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day." Id. For this reason, having the text prominently displayed on schoolroom walls implies a governmental endorsement of religion. The final six commandments, however, deal with honoring one's parents, killing or murder, adultery, stealing, bearing false witness, and covetousness;[8] all of these prescribe rules of conduct for dealing with other people. Much of our private and public law derives from these final six commandments. See Stone, 449 U.S. at 45 (Rehnquist, J.,

---

[8] Exodus 20:12–17.

24

dissenting) (noting the "undeniable" and "significant" impact that the Ten Commandments have had on "the development of legal codes of the Western World"). For this reason, although primarily having a religious connotation, the Ten Commandments can, in certain contexts, have a secular significance. See County of Allegheny, 492 U.S. at 615 (opinion of Blackmun, J.) (noting that some holidays have "both religious and secular dimensions").

The proper inquiry in this case is which of these two messages the Seal is most likely to communicate to a reasonable observer. In making this determination, we have considered four factors.

### a.    *Limited Context*

First, the Seal is solely limited to the very narrow context of authenticating legal documents. There is a tight nexus between a legitimate secular purpose for using the pictograph of the Ten Commandments and sword (using recognizable symbols of secular law, ones that suggest the force of law) and the context in which the Seal is used (authentication of legal documents). Even when the government's motives are permissible, if there is not a tight nexus between the secular purpose for using a symbol and the context in which the symbol appears, a reasonable observer may suspect that the true reason for

adopting the symbol was to endorse religion. Cf. Edwards, 482 U.S. at 586 (applying Lemon's purpose prong to strike down Louisiana's creation-science and evolution-science act because, *inter alia*, there was not a tight fit between the act's stated purpose of promoting academic freedom and the act's effect, which limited teachers' autonomy in deciding how to teach science). In this case, a reasonable observer has no reason to harbor such suspicions,[9] as the use of this recognizable legal symbol promotes the secular purpose of enabling individuals to recognize the legal validity of documents.

In addition to using the Seal in a manner that promotes a secular purpose, the clerk of the superior court has not used the Seal in contexts in which a reasonable observer might not understand the relationship between the Seal's symbols and its secular purpose. Courts have held the use of religious symbols to be unconstitutional when the symbols have appeared in contexts in which the links between the symbols and their supposed secular purposes are not readily apparent. Cf. Friedman v. Bd. of County Comm'rs of Bernalillo County, 781 F.2d 777 (10th Cir. 1985) (applying Lemon's effect test and holding that a county-wide seal with religious imagery was unconstitutional). Here, however, the Seal has not proliferated to contexts unrelated to document authentication.

---

[9] Again, under the effect prong, the inquiry is what effect the tablets and sword has in this context and setting. County of Allegheny, 492 U.S. at 598.

26

As stated previously, with the exception of the embossing instruments themselves, no representations of the Ten Commandments or other religious symbols appear in the office of the court clerk; the Seal is not displayed in the superior court's courtroom or anywhere else in the courthouse; and the Seal is not used on official stationery or envelopes. Rather, the seal of the state of Georgia appears on the office's official stationery. The clerk of the court has confined the use of the Seal to the very limited context of authenticating legal documents, where reasonable observers would logically perceive it as a symbol of the force of law.

### b. Use of Other Symbols in the Seal

Second, the outline of the Ten Commandments is not the only symbol in the Seal; the Seal also has a depiction of a sword intertwined with the tablets. The presence of this additional symbol increases the probability that observers will associate the Seal with secular law rather than with religion.

Appellants argue that the sword is a Christian symbol that enhances the religious effect of the seal. We conclude, however, that the superior court's use of the sword cuts the other way when applying the effect test. Although the sword might occasionally serve as a symbol of Christianity, the sword is among

27

the most recognizable symbols of the secular legal system. For example, numerous depictions of the female figure *Justice* are located on the grounds, in the courtroom, and in the frieze sculptures of the United States Supreme Court, usually holding a sword in her right hand and scales in her left.[10] The sword, in this context, symbolizes the power of law, which *Justice* stands ready to use in "the allegorical story of the battle of *Good Versus Evil*."[11] In fact, another representation of *Justice* with a sword in her hand, a statue entitled "Miss Justice," is located in the parking lot of the Augusta-Richmond County municipal building, which houses the superior court. This statute probably predates the Seal's inception, and it is likely that most members of the community who transact business with the county and the superior court have seen this statue and understand the statue's sword to be a symbol of the law.

Given the strong symbolic associations between the sword and the power of law, a reasonable observer is likely to understand the Seal's depiction of the Ten Commandments intertwined with the sword as a symbol of the secular legal system. Like the secular decorations surrounding the crèche in Lynch or the other lawgivers who accompany Moses and the Ten Commandments on the

---

[10] See Figures of *Justice*, Information Sheet, Office of the Curator, Supreme Court of the United States, *at* http://www.supremecourtus.gov/about/figuresofjustice.pdf.

[11] Id.

28

south wall frieze of the Supreme Court building,[12] the Seal's sword and the words "SUPERIOR COURT RICHMOND COUNTY, GA" contextualize the Ten Commandments pictograph. Cf. County of Allegheny, 492 U.S. at 598 ("Here, unlike in *Lynch*, nothing in the context of the display detracts from the crèche's religious message.").

### c. *Size and Placement of the Seal*

Third, the Seal is relatively small, and because it is generally placed near the bottom or on the last page of legal documents, it is also discreet. In assessing the effect that a symbol has on a reasonable observer, courts often analyze the size and placement of the challenged practice. For example, in Allegheny County, the Supreme Court noted the crèche display's special placement in the Grand Staircase, "the 'main' and 'most beautiful' part of the building that is the seat of county government." Allegheny County, 492 U.S. at 600; see also id. at 626 (O'Connor, J., concurring) ("The display of religious symbols in public areas of core government buildings runs a special risk of making religion relevant, in reality or public perception, to status in the political community.") In Stone, the Court observed that the text of the Ten

---

[12] See Courtroom Friezes: North and South Walls, Information Sheet, Office of the Curator, Supreme Court of the United States, *at* http://www.supremecourtus.gov/about/north& southwalls.pdf.

Commandments appeared on the wall of "each public elementary and secondary school classroom in the Commonwealth," where "[i]f the posted copies of the Ten Commandments [were] to have any effect at all, it [would] be to induce the schoolchildren to read, meditate upon," and perhaps "venerate and obey" the Commandments. Stone, 449 U.S. at 39 n.1, 42.

Two circuit courts of appeals have dealt with Ten Commandments monuments that were located or that were to be located on the grounds of state capitols. Adland v. Russ, 307 F.3d 471 (6th Cir. 2002); Ind. Civil Liberties Union v. O'Bannon, 259 F.3d 766 (7th Cir. 2001). In both cases, the monuments were "prominently located" at "the heart of state government" and displayed the text of the Ten Commandments in "large lettering." Adland, 307 F.3d at 486; see also Ind. Civil Liberties Union, 259 F.3d at 772–73. Although the monument in Adland also contained text from other sources of secular law, the Ten Commandments "occup[ied] the bulk of the surface area and accordingly plainly dominate[d] the monument." Adland, 307 F.3d at 486; see also Ind. Civil Liberties Union, 259 F.3d at 772–73 (affirming the grant of a preliminary injunction against constructing the monument because the monument was large and the lettering for the Commandments was larger than the lettering for the Bill of Rights). The Adland court found that a reasonable

30

observer would infer religious endorsement, because the "Ten Commandments monument physically dominate[d] the 'historical and cultural display' in the Capitol garden area" and its "sheer dimensions . . . dwarf[ed] all the other memorials" in the area.

All of these cases found the use of the religious symbols to be unconstitutional, and all but the Stone opinion specifically analyzed the effect that the symbols would have on a reasonable observer. All of the cases involved displays that were large or "in your face" and occupied a place of prominence or special honor, often dominating the other objects surrounding them.[13] In contrast, the pictograph of the tablets and sword is at most only one inch in diameter and is not the focal point of any governmental display in an important public building. Consequently, the Seal's size and placement make it less likely that a reasonable observer would believe that the government intended to send a message of religious endorsement.[14]

When assessing the effect that a governmental practice would have on a reasonable observer, we recognize that it would be improper to rely solely on any single factor. The fact that a symbol is small or inconspicuous, alone, is not

[13] Referring to the size and placement of the Seal, the District Court found that the display of the Seal was not "pervasive." Order at 13–15.

[14] One plaintiff, Shirley Fencl, acknowledged that although she had possessed documents bearing the Seal, she had not noticed the pictograph of the tablets and sword until seeing it in the newspapers and "agree[ing] to this lawsuit." Fencl Dep. at 12–14.

31

dispositive. The caselaw shows that exclusively religious symbols, such as a cross, will almost always render a governmental seal unconstitutional, no matter how small the religious symbol is. See, e.g., Robinson v. City of Edmond, 68 F.3d 1226 (10th Cir. 1995); Harris v. City of Zion, Lake County, Ill., 927 F.2d 1401 (7th Cir. 1991); Friedman, 781 F.2d at 777. Size and placement are, however, factors to consider in the overall effect-prong analysis.

    *d.    Fact that Seal Does Not Contain the Ten Commandments' Text*

Finally, unlike the depiction of the Ten Commandments in the Stone case, the text of the Commandments does not appear on the Seal. This distinction is material under the effect test. Because the words "Lord thy God" and the purely religious mandates (commandments one through four) do not appear on the Seal, a reasonable observer is less likely to focus on the religious aspects of the Ten Commandments. Unlike the textual posting in Stone, the Seal does not "induce [observers] to read, meditate upon, perhaps to venerate and obey, the Commandments." Stone, 449 U.S. at 42. The fact that the Seal does not show the Commandments' text distinguishes this case from the monuments held to be unconstitutional in Adland v. Russ, 307 F.3d 471 (6th Cir. 2002), and Indiana Civil Liberties Union v. O'Bannon, 259 F.3d 766 (7th

32

Cir. 2001), where the text appeared in large lettering. Instead, the use of Roman numerals rather than text on the tablets—together with the other factors already discussed—allows a reasonable observer to infer that the government is using the Ten Commandments to symbolize the force of law.

Although none of the above factors, standing alone, would be sufficient to satisfy the effect test, in this case the combination of these four factors favors Appellees' position. Furthermore, we note that the Seal has been in use for at least 130 years, a fact that arguably supports Appellees under the effect test.[15] Like all holdings interpreting the Establishment Clause, our holding applies only to the particular facts of this case. See Lynch, 465 U.S. at 678–79. Just as there is no per se rule that a crèche is constitutional when placed in a display celebrating the holiday season, compare id. at 685, with Allegheny County, 492 U.S. at 601–02, there is no per se rule that the use of the Ten Commandments will be constitutional when used in the context of the legal system.

---

[15] Appellees' argument that the long use of the Seal affects our analysis under the effect prong, see Appellees' br. at 38, implicates Justice O'Connor's observations about the effect of "the history and ubiquity of a practice." See County of Allegheny, 492 U.S. at 630–31 (O'Connor, J., concurring) (discussing, *inter alia*, the reason for upholding the practice of legislative prayer in Marsh v. Chambers, 463 U.S. 783 (1983)). Yet, because the combination of the four factors already discussed supports our conclusion under the effect test, we need not address what effect, if any, the "history and ubiquity" of the Seal would have in applying the effect prong.

IV. CONCLUSION

Because the use of the Seal does not have the purpose or primary effect of endorsing religion, we AFFIRM the District Court.

EDMONDSON, Chief Judge, concurring in the judgment:

I concur in today's judgment of the Court. I agree that the pertinent seal does <u>not</u> violate the Establishment Clause. I write separately because I am uncomfortable with the characterization and the manner of application of some of the precedents discussed as the Court explains its decision. I, however, readily agree that no precedent comes close to compelling the conclusion that Defendants violate the Federal Constitution by use of the seal.