

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-26-2003

# Freethought Society v. Chester

Precedential or Non-Precedential: Precedential

Docket No. 02-1765

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Freethought Society v. Chester" (2003). *2003 Decisions.* Paper 398.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/398

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed June 26, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-1765

FREETHOUGHT SOCIETY, of Greater Philadelphia;
SALLY FLYNN

v.

CHESTER COUNTY; COLIN A. HANNA;
KAREN L. MARTYNICK; ANDREW E. DINNIMAN;
each of whom is sued in their official capacities
as CHESTER COUNTY COMMISSIONERS,

Appellants

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 01-cv-5244)
District Judge: Honorable Stewart Dalzell

Argued: April 7, 2003

Before: BECKER,* BARRY and BRIGHT,**
*Circuit Judges*

(Filed: June 26, 2003)

---

* Judge Becker completed his term as Chief Judge on May 4, 2003.

** The Honorable Myron H. Bright, United States Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

WILLIAM M. MCSWAIN (ARGUED)
ALISON D. KEHNER
MICHAEL L. BERRY
Dechert
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103

WILLIAM M. JANSSEN (ARGUED)
SUSAN M. RABII
AMY S. KLINE
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102

THOMAS C. ABRAHAMSEN
Office of the Chester County
 Solicitor
2 North High Street
Chester County Courthouse
Suite 150
West Chester, PA 19380

*Counsel for Appellants*

STEFAN PRESSER (ARGUED)
American Civil Liberties Union
 of Pennsylvania
125 South Ninth Street
Suite 701
Philadelphia, PA 19107

SETH KREIMER
3400 Sansom Street
Philadelphia, PA 19104

PETER GOLDBERGER
50 Rittenhouse Place
Ardmore, PA 19003

*Counsel for Appellees*

ALFRED W. PUTNAM, JR. (ARGUED)
KIRKE D. WEAVER
D. ALICIA HICKOK
Drinker Biddle & Reath LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103

*Counsel for Amicus Chester County
Historic Preservation Network in
Support of Appellants*

D. MICHAEL FISHER
CALVIN R. KOONS
JOHN G. KNORR, III
Office of Attorney General
Appellate Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA 17120

*Counsel for Amicus Commonwealth
of Pennsylvania in Support of
Appellants*

ROBERT L. KNUPP
MARK A. MATEYA
Knupp, Kodak & Imblum, P.C.
PO Box 11848
407 North Front Street
Harrisburg, PA 17108

*Counsel for Amicus County
Commissioners Association of
Pennsylvania in Support of
Appellants*

FRANCIS J. MANION
American Center for Law and
 Justice
6375 New Hope Rd.
New Hope, KY 40052

*Counsel for Amicus American Center
for Law and Justice in Support of
Appellants*

4

BURTON CAINE
Temple University School of Law
1719 N. Broad Street
Philadelphia, PA 19122

*Counsel for Amici Americans for
Religious Liberty, The American
Humanist Association, The American
Ethical Union, The Philadelphia
Ethical Society, The Unitarian
Universalist Association, and The
Society for Humanistic Judaism in
Support of Appellees*

MARC D. STERN
American Jewish Congress
15 East 84th Street
New York, NY 10028

NANCY WINKELMAN
STEWART M. WEINTRAUB
O. SCOTT BARBER
Schnader Harrison Segal &
  Lewis LLP
1600 Market Street
Philadelphia, PA 19103

*Counsel for Amicus American Jewish
Congress in Support of Appellees*

AYESHA N. KHAN
ALEX J. LUCHENITSER
Americans United for Separation
 of Church and State
518 C Street NE
Washington, DC 20002

STEVEN M. FREEMAN
STEVEN C. SHEINBERG
Anti-Defamation League
823 United Nations Plaza
New York, NY 10017

*Counsel for Amici Americans United
For Separation of Church and State
and Anti-Defamation League in
Support of Appellees*

---

**OPINION OF THE COURT**

---

BECKER, *Circuit Judge.*

The Chester County Courthouse in West Chester, Pennsylvania, erected in 1846, was designed by Thomas Ustick Walter, renowned architect of the United States Capitol. In 1920, following a public dedication ceremony with both religious and secular overtones, the Chester County Commissioners accepted a bronze plaque displaying a Protestant version of the Ten Commandments for placement on the Courthouse facade from a group of local citizens who represented an organization known as the Religious Education Council. The plaque was affixed near what was then the entrance to the Courthouse. It has remained there for over eight decades, but during that time nothing has been done by the County to draw attention to, celebrate or even maintain the plaque.

Until a few years ago, visitors to the Courthouse would walk past the plaque on their way in. However, that entrance was closed, so visitors now enter via the modern addition to the Courthouse, some seventy feet to the north. While the title of the plaque, "The Commandments," is legible to a visitor walking along the sidewalk to or from the north wing main entrance, a visitor would have to climb the steps in front of the former entrance to read the rest of the text.

The present lawsuit was brought by Plaintiff Sally Flynn, a Chester County resident who noticed the plaque as early as 1960 but was apparently not bothered enough by it to

complain until 2001, and the Freethought Society of Greater Philadelphia (of which Flynn is a member) after the County Commissioners denied Flynn's request to remove the Ten Commandments plaque. Freethought, according to its founder Margaret Downey, is "a forum for atheists, agnostics, freethinkers to meet, socialize and exchange ideas." The defendants are Chester County and the Chester County Commissioners, in their official capacities.

The plaintiffs contend that the plaque's placement is in violation of the Establishment Clause of the First Amendment because the Religious Education Council donated the plaque (and the County accepted it) for religious purposes and because the effect of the plaque is to cause a reasonable observer to believe that the County is endorsing religion. The defendants disagree. They maintain that our focus should be on the Commissioners' 2001 action, or more precisely inaction, in denying Flynn's request that the plaque be removed, rather than on the original purpose for accepting the decalogue in 1920. They also assert that the long history of the plaque, and the fact that the County has not taken any action to highlight or celebrate the plaque since its placement, change the overall effect of the plaque so that when it is viewed in context, a reasonable observer would not perceive it to be an endorsement of religion by the County. The defendants also contend that we should depart from the purpose/effect inquiry used in religious display cases, first set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612-613 (1971), and craft an exception for historic artifacts such as this plaque.

This appeal presents a number of important legal questions that inform our ultimate analysis. We identify two questions at this juncture: (1) what principles of Establishment Clause jurisprudence should we use to decide the case; and (2) whether we should focus on the events of 1920 (when the plaque was erected) or the events of 2001 (when the County Commissioners declined to remove the plaque)? With respect to the first question, in light of our decision in *Tenafly Eruv Association, Inc. v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002), we believe that Justice O'Connor's modification of *Lemon*, known as the "endorsement" test, applies in religious display cases of

this type. Under this approach, we collapse the " 'purpose' and 'effect' prongs into a single inquiry: would a reasonable, informed observer, *i.e.*, one familiar with the history and context . . . perceive the challenged government action as endorsing religion?" *Id.* at 174. However, in an abundance of caution, we will also analyze the case under the much maligned *Lemon* test. While consideration of the effect of the plaque is coextensive with our discussion of the "endorsement" test, which focuses on the perceptions of the reasonable observer, under *Lemon*, there must also be a legitimate secular purpose for the County's actions, although the County's purpose need not be "exclusively secular." *Lynch v. Donnelly*, 465 U.S. 668, 681 n. 6 (1984).

With respect to the second question, we think that the appropriate focus of our inquiry is on the events of 2001, when the Commissioners declined to remove the plaque. Applying the "endorsement" test, we conclude that: (1) the reasonable observer would be aware of the approximate age of the plaque and the fact that the County has done nothing since it was erected to highlight or celebrate the plaque; (2) because of the plaque's age and its placement on an historic Courthouse, the reasonable observer would believe that the plaque itself is historic; and (3) the reasonable observer would not believe that the County's inaction was motivated by a desire to endorse religion, or some religious practice such as Sabbatarianism, but rather by a desire to preserve a longstanding plaque. As such, the overall effect of the display, when viewed in the context of its history, does not appear to be an endorsement of religion.

Alternatively, applying the *Lemon* test, under which the County must also have a legitimate secular purpose, we note that the District Court found believable the testimony of the Commissioners that they thought the Ten Commandments plaque celebrated the significance of the decalogue as a foundational legal document. We note too that the Commissioners' conclusions are buttressed by some well documented history, presented by Chester County and its amici, to the effect that the Ten Commandments have an independent secular meaning in our society because they are regarded as a significant basis

of American law and the American polity, including the prohibitions against murder and blasphemy. Because the purpose prong is subjective, it appears that the Commissioners' articulation of a secular purpose for refusing to remove the plaque met the requirements of *Lemon*.

Based on the foregoing conclusions, on which we will elaborate at length, we will reverse the judgment of the District Court and vacate the permanent injunction ordering the removal of the plaque.

## I. Facts and Procedural History

The plaque at issue was affixed to the east facade of the Courthouse at a dedication ceremony on December 11, 1920, upon the initiative of the Religious Education Council. The Council had appeared before the Chester County Commissioners requesting permission to erect a bronze plaque containing the text of the Ten Commandments. The County accepted the donation of the plaque, which was purchased exclusively with private funds, "to the people of Chester County." Samuel C. Hodge, a Protestant Minister and a member of the Religious Education Council, presided over the dedication ceremony, at which both the religious and secular significance of the Ten Commandments were stressed. In his address, entitled "The Relation of the Ten Commandments to Jurisprudence," Judge J. Frank E. Hause, the keynote speaker at the dedication ceremony, admonished those in attendance:

> Have you remembered the Sabbath Day to keep it holy? If you disobey the commandments here and escape punishment, there is yet the punishment which will surely be meted out on the day of judgment.

But Judge Hause also told his audience "that with very few exceptions every statute on our books can be traced to the Ten Commandments, which are the foundation stone of all civilized countries."

The Chester County Courthouse is the seat of government in Chester County. It houses the County's

judiciary, including the Adult Probation Department, and the offices of the County Commissioners, Treasurer, Controller, District Attorney, Public Defender, Sheriff, Prothonotary, Clerk of Court, Register of Wills, and Solicitor. It was estimated at trial that 250,000 people visit the Courthouse each year for a variety of purposes, *e.g.*, to attend trials and to secure marriage licenses, dog licenses, passports and deeds. There is no evidence in the record suggesting that the County expended public funds to affix the plaque to the side of the Courthouse, or to maintain it since 1920.

The plaque reads (a photograph is attached):

THE COMMANDMENTS (in larger text)

THOU SHALT HAVE NO OTHER GODS BEFORE ME. THOU SHALT NOT MAKE UNTO THEE ANY GRAVEN IMAGE, OR ANY LIKENESS OF ANY THING THAT IS IN HEAVEN ABOVE, OR THAT IS IN THE EARTH BENEATH, OR THAT IS IN THE WATER UNDER THE EARTH:
THOU SHALT NOT BOW DOWN THYSELF TO THEM, NOR SERVE THEM:
For I the Lord Thy God am a Jealous God, Visiting the Iniquity of the Fathers upon the Children unto the Third and Fourth Generation of Them that Hate me. And Shewing Mercy unto Thousands of Them that Love Me and Keep My Commandments
THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN:
For the Lord will not Hold him Guiltless that Taketh His Name in Vain.
REMEMBER THE SABBATH DAY, TO KEEP IT HOLY. SIX DAYS SHALT THOU LABOR AND DO ALL THY WORK:
BUT THE SEVENTH DAY IS THE SABBATH OF THE LORD THY GOD: IN IT THOU SHALT NOT DO ANY WORK, THOU, NOR THY SON, NOR THY DAUGHTER, THY MANSERVANT, NOR THY MAIDSERVANT, NOR THY CATTLE, NOR THY STRANGER THAT IS WITHIN THY GATES:
For in Six Days the Lord Made Heaven and Earth, the Sea, and All That in Them is, and Rested the Seventh

Day, Wherefore the Lord Blessed the Sabbath Day, and Hallowed it.
HONOR THY FATHER AND THY MOTHER:
That Thy Days May be Long upon the Land which the Lord Thy God Giveth Thee.
THOU SHALT NOT KILL.
THOU SHALT NOT COMMIT ADULTERY.
THOU SHALT NOT STEAL.
THOU SHALT NOT BEAR FALSE WITNESS AGAINST THY NEIGHBOUR.
THOU SHALT NOT COVET THY NEIGHBOUR'S HOUSE.
THOU SHALT NOT COVET THY NEIGHBOUR'S WIFE, NOR HIS MANSERVANT, NOR HIS MAIDSERVANT, NOR HIS OX, NOR HIS ASS, NOR ANY THING THAT IS THY NEIGHBOUR'S.

SUMMARY

THOU SHALT LOVE THE LORD THY GOD WITH ALL THINE HEART,
AND WITH ALL THY SOUL AND WITH ALL THY MIND.
THOU SHALT LOVE THY NEIGHBOUR AS THYSELF.

The text of the Ten Commandments on the plaque is taken from the King James version of the Bible, Exodus 20:2-17 and Deuteronomy 5:6-21; the Summary is also from the King James version, Matthew 22:37 and 39. *Freethought Soc'y*, 191 F.Supp. 2d 589, 591 (E.D. Pa. 2002). Although the Ten Commandments is a shared Judeo-Christian text, the King James Bible, commissioned in 1603 by King James I of England, is a Protestant version of the Bible. While the Ten Commandments are taken from the Old Testament, the "Summary" is taken from the New Testament, which is not part of the Jewish Bible. Rabbi Leonard Gordon testified that Jews would find this version of the Ten Commandments objectionable.[1] In contrast,

_____

1. According to Rabbi Gordon, who is affiliated with Conservative Judaism, Jews would object to the use of the phrase "thou shalt not kill" as opposed to "thou shalt not murder." Additionally, he views the "Summary" as problematic for Jews, since it implies that certain commandments are more important than others, and because it is taken

Father Francis X. Meehan testified that nothing in this version of the Ten Commandments would be offensive to Roman Catholics. While he noted that the New American Bible, the first edition of the Catholic scriptures in American English to be translated from the original languages, is the version of the Bible authorized for Catholic liturgical use, he explained that "there are other scriptures that are authorized for general reading and praying." He also commented that there is at least one critical difference in the Catholic interpretation of the Ten Commandments — the New American Bible uses the word "idols" in place of "graven images."

The plaque is 50 inches tall and 39 inches wide; the background of the plaque is dark in color. It is positioned adjacent to the historic entrance to the Courthouse. The Courthouse itself is an historically significant building. The architect of the original Chester County Courthouse was Thomas Ustick Walter, designer of the U.S. Capitol's iron dome. Walter also designed the celebrated Girard College building in Philadelphia. The Courthouse, built in 1846, has been placed on the National Register of Historic Places; the Ten Commandments plaque, however, was not mentioned on the application for that designation.

There are six Corinthian columns in front of the facade of the Courthouse upon which the plaque is affixed; from certain angles, the columns obscure the plaque, though the plaque is clearly visible when standing directly in front of it. The portico in front of the east facade, where the Ten Commandments plaque is displayed, spans 64 feet. Only the title, "The Commandments," is legible to a passerby on the sidewalk in front of the Courthouse. Indeed, Commissioner Dinniman observed that a passerby, reading only "The Commandments," would "not know whether they're the commandments of the Commissioners, the

---

from the New Testament. Finally, this version of the Ten Commandments does not contain the First Commandment in Jewish tradition: "I am the Lord your God who brought you out of the land of Egypt." However, Commissioner Dinniman, a practicing Reform Jew, disagreed with Rabbi Gordon's statement that Jews would be aware of these discrepancies, or troubled by them.

President Judge, or of Moses." To read the text of the Commandments, it is necessary to climb the steps leading to the historic entrance (as the attached photographs demonstrate). But since this entrance was closed in 2001 for security reasons and to cut costs (it would have been very expensive to make the old entrance ADA-compliant), and the new entrance is located further north along the sidewalk, there is no reason for a visitor to the Courthouse to climb these steps.

There was testimony at trial that the esplanade in front of the east facade of the Courthouse is sometimes used for public gatherings, such as political rallies. However, it is not clear where the public is positioned during these gatherings, or the extent to which attendees can read the Commandments' text. Flynn testified that she saw the plaque while attending political rallies in front of the Courthouse, including while attending a "counter-protest" against demonstrators protesting the anniversary of *Roe v. Wade*. However, Commissioner Dinniman testified that at most political rallies, the plaque is generally blocked from the view of rally attendees by the placement of a podium and flags at the top of the steps in front of the plaque.

A number of other plaques, as well as signs, are affixed to the east facade of the Courthouse, alongside the Ten Commandments plaque. Adjacent to the Ten Commandments plaque is a no-smoking sign which measures 24 inches tall and 17 inches wide and a small West Chester Borough Historic Architecture Certification Plaque. On the same facade, but on the other side of the historic entrance door, there are: (1) three immediately adjacent plaques concerning Courthouse hours and building access which together measure 53 inches tall and 26 inches wide; (2) a small plaque stating that the property has been placed on the National Register of Historic Places; and (3) a no-skateboarding sign which measures 24 inches tall and 17 inches wide.[2] While the age of the Ten

---

2. There are various other plaques and monuments in the vicinity of the Courthouse that are further away from the Ten Commandments plaque, including: (1) a sundial on Market Street which is approximately 97 feet from the Ten Commandments plaque; (2) a plaque commemorating

Commandments plaque is not obvious from viewing the plaque itself, it appears to be older than the administrative plaques affixed to the building.

The Ten Commandments plaque remained on display on the Courthouse without incident until the events leading up to the present lawsuit. Plaintiff Sally Flynn has been a resident of Chester County since 1960, and has been coming to the Courthouse since then, but never complained about the plaque until 2001. She has had reason to go to the Chester County Courthouse on many occasions since she has lived in the area; *e.g.*, to secure a license for her dog, to appear for jury duty, to attend political rallies, and to testify as a victim/witness in a criminal case.

Flynn is a member of plaintiff Freethought Society of Greater Philadelphia, a forum for atheists, agnostics and other "freethinkers" to meet, socialize, and exchange ideas. Flynn has considered herself an atheist since approximately 1996. Many members of Freethought reside in Chester County, including the founder of Freethought, Margaret Downey. Downey has viewed the Ten Commandments plaque on numerous occasions as well, including: while procuring a passport, attending a hearing in the Courthouse, and while obtaining licenses to solemnize marriages, in her capacity as a Secular Humanist celebrant.[3]

---

World War II veterans, approximately 59 feet from the Ten Commandments (it is 20 inches by 16 inches wide); (3) a Civil War veterans statute which is approximately 12 feet high and is located 50 feet from the Ten Commandments; (4) an historic Chester County marker and horse watering trough approximately 64 and 72 feet, respectively, from the Ten Commandments plaque; (5) a County time capsule measuring 24 inches by 12 inches, embedded in the ground 56 feet from the Ten Commandments plaque; and (6) a plaque commemorating the first County Courthouse, affixed to a pillar on the north wing Courthouse annex approximately 78 feet from the Ten Commandments plaque.

3. We do not find convincing the defendants' argument that neither Flynn individually nor Freethought as an organization has standing to sue. We agree with the District Court that "[t]here seems to be little question that plaintiff Sally Flynn has 'suffered an injury in fact' within the meaning of *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992),"

On August 20, 2001, counsel for Flynn and Freethought wrote to the Chester County Commissioners and requested the removal of the Ten Commandments plaque. On August 23, 2001, the Commissioners responded that they would not remove it. Freethought and Flynn then commenced the present action in the District Court for the Eastern District of Pennsylvania against Chester County and Colin A. Hanna, Karen L. Martynick, and Andrew E. Dinniman in their official capacities as Chester County Commissioners. The plaintiffs alleged a violation of the First Amendment pursuant to 42 U.S.C. § 1983. After a brief period of discovery, the District Court conducted a two-day evidentiary hearing.

Two of the three County Commissioners were witnesses at the evidentiary hearing. Neither was asked to explain why he decided to leave the plaque in place. They were, however, questioned as to their views of the plaque. Commissioner Hanna responded that to him, it symbolized the "two wing theory of our polity," in which "faith and reason . . . as a historical reality worked together to create and maintain the American experiment." *Freethought Soc'y*, 191 F.Supp. 2d at 597-98. Similarly, Commissioner Dinniman testified:

> The Ten Commandments . . . is the story of people in the wilderness and coming out of the wilderness to find order, to find civilization through the law. . . . And I think that the Ten Commandments on the wall of the Courthouse symbolizes civilization. Symbolizes the desire for order. Symbolizes the desire for a just and orderly society. . . . It's probably one of the best known stories of our society, and it's used both religiously and secularly. . . . It's a symbol of law. It's a symbol of order in our society.

---

and that "[a]s an organization with members like Ms. Flynn from Chester County, the Freethought Society also has associational standing under *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)." *Freethought Soc'y*, 191 F.Supp. 2d at 593. Likewise, we do not believe that the defendants have demonstrated that Flynn waived her right to bring this action (or that the statute of limitations has expired) because she noticed the plaque in the 1960s but did not bring an action until 2001.

The District Court found that both Commissioners were "serious, reflective public officials who plainly did not lightly come to their conclusions." *Freethought Soc'y*, 191 F.Supp. 2d at 597.

On March 6, 2002, the District Court filed an opinion and entered an order declaring the plaque unconstitutional based on the conclusion that it violated the Establishment Clause of the First Amendment. The District Court also filed a permanent injunction ordering the removal of the plaque. The defendants timely appealed. Pending appeal, the plaque has been concealed by a metal cover.

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(3) and we have jurisdiction pursuant to 28 U.S.C. § 1291. We review the grant of a permanent injunction for abuse of discretion, yet since an abuse of discretion exists where a decision rests upon an erroneous conclusion of law, we have plenary review over the District Court's underlying legal conclusions. *ACLU of New Jersey v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1476 (3d Cir. 1996).

## II.  The Correct Establishment Clause Framework

We must first determine the appropriate framework to use when analyzing whether the Ten Commandments plaque violates the Establishment Clause, an inquiry that is somewhat murky, even in light of the recent religious display cases decided by the Supreme Court. In *Lemon v. Kurtzman*, the Supreme Court set forth three factors that should be considered when a violation of the Establishment Clause is alleged: (1) whether the government practice had a secular purpose; (2) whether its principal or primary effect advanced or inhibited religion; and (3) whether it created an excessive entanglement of the government with religion. 403 U.S. 602, 612-613 (1971). That decision has received much criticism. *See, e.g., Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398-399 (1993) (Scalia, J., concurring) (comparing *Lemon* to "some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed

and buried" and collecting opinions) and the cases identified in the margin.[4]

Writing in a separate concurrence in *Lynch v. Donnelly*, a case involving a nativity scene included in the defendant city's Christmas display, Justice O'Connor proposed a clarification of the *Lemon* factors to be used in cases involving the display of religious objects by private groups on government property:

> The central issue in this case is whether [the defendant] has endorsed Christianity by its display of the creche. To answer that question, we must examine both what [the defendant] intended to communicate in displaying the creche and what message the city's display actually conveyed. The purpose and effect prongs of the *Lemon* test represent these two aspects of the meaning of the city's action.
>
> . . .

---

4. Other sitting Supreme Court Justices have also criticized *Lemon*, suggesting that *Lemon* might be overruled if it were reconsidered. The Court of Appeals for the Seventh Circuit laid out the criticisms of *Lemon* made by current Supreme Court Justices in *Books v. City of Elkhart*, 235 F.3d 292, 301, n. 6 (2000); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 319 (2000) (Rehnquist, C.J., dissenting) (stating that "*Lemon* has had a checkered career in the decisional law of this Court" and collecting opinions criticizing *Lemon*); *County of Allegheny v. ACLU*, 492 U.S. 573, 655-56 (Kennedy, J., concurring in the judgment in part and dissenting in part) (stating that, although he found the *Lemon* test useful in judging the constitutionality of holiday displays, he did "not wish to be seen as advocating, let alone adopting, that test as our primary guide in this difficult area"); *Committee for Pub. Ed. & Religious Liberty v. Regan*, 444 U.S. 646, 671 (1980) (Stevens, J., dissenting) (desiring to avoid "continuing with the sisyphean task of trying to patch together the 'blurred, indistinct, and variable barrier' described in *Lemon*") (citation omitted). Moreover, Justices Rehnquist, Scalia and Thomas dissented from the denial of certiorari in *Books v. City of Elkhart*, criticizing the Seventh Circuit for "applying the oft-criticized framework set out in *Lemon*." 532 U.S. 1058 (2001). However, since *Lemon* has not been explicitly overruled, we are bound to follow either it or the subsequent "endorsement" test which modifies and explains *Lemon*. *See* discussion in text.

The purpose prong of the *Lemon* test requires that a government activity have a secular purpose. That requirement is not satisfied, however, by the mere existence of some secular purpose, however dominated by religious purposes. . . . The proper inquiry under the purpose prong of *Lemon*, I submit, is whether the government intends to convey a message of endorsement or disapproval of religion.

. . .

Focusing on the evil of government endorsement or disapproval of religion makes clear that the effect prong of the *Lemon* test is properly interpreted not to require invalidation of a government practice merely because it in fact causes, even as a primary effect, advancement or inhibition of religion. . . . What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion.

465 U.S. 668, 690-92 (1984) (O'Connor, J., concurring).

Justice O'Connor's concurrence in *Lynch* is particularly significant because it decided the outcome of the case; without her vote the justices were split four to four.[5] In a later concurrence, Justice O'Connor explained that to determine whether a display endorses religion, it is necessary to ask whether "a reasonable observer would view [the display] . . . as a disapproval of his or her particular religious choices." *County of Allegheny v. ACLU*, 492 U.S. 573, 631 (1989) (O'Connor, J., concurring).[6]

5. Chief Justice Burger delivered the opinion of the Court in *Lynch,* which was joined by Justices White, Powell, Rehnquist and O'Connor. Justice O'Connor filed a concurring opinion. Justice Brennan filed a dissenting opinion which Justices Marshall, Blackmun and Stevens joined. Justice Blackmun filed a dissenting opinion which Justice Stevens joined.

6. Justice Blackmun announced the judgment of the Court in *Allegheny* and delivered the opinion of the Court with respect to Parts III-A, IV, and V, which Justices Brennan, Marshall, Stevens, and O'Connor joined, an opinion with respect to Parts I and II, which Justices Stevens and O'Connor joined, an opinion with respect to Part III-B, which Justice

The test originally proposed by Justice O'Connor in her concurrence in *Lynch*, described above, has become known as the "endorsement" test, and has been adopted by the majority in other religious display cases. For example, Justice Blackmun, writing the opinion for the Court in *Allegheny*, a case involving the display of a creche and a menorah, concluded:

> In recent years, we have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of "endorsing" religion, a concern that has long had a place in our Establishment Clause jurisprudence.
>
> . . .
>
> [T]he concurrence [O'Connor's in *Lynch*] articulates a method for determining whether the government's use of an object with religious meaning has the effect of endorsing religion. The effect of the display depends upon the message that the government's practice communicates: the question is "what viewers may fairly understand to be the purpose of the display." That inquiry, of necessity, turns upon the context in which the contested object appears.
>
> . . .
>
> Since *Lynch*, the Court has made clear that, when evaluating the effect of government conduct under the Establishment Clause, we must ascertain whether "the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling

Stevens joined, an opinion with respect to Part VII, which Justice O'Connor joined, and an opinion with respect to Part VI. Justice O'Connor filed an opinion concurring in part and concurring in the judgment, in Part II which Justices Brennan and Stevens joined. Justice Brennan filed an opinion concurring in part and dissenting in part, which Justices Marshall and Stevens joined. Justice Stevens filed an opinion concurring in part and dissenting in part, which Justices Brennan and Marshall joined. Justice Kennedy filed an opinion concurring in the judgment in part and dissenting in part, which Chief Justice Rehnquist and Justices White and Scalia joined.

denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices."

492 U.S. at 592-598 (internal citations omitted).

In *Capitol Square Review and Advisory Board v. Pinette,* Justice Scalia also acknowledged the use of the "endorsement" test in religious display cases, although the Court held in that case that the defendant city would not violate the Establishment Clause by allowing a display of a cross by the Ku Klux Klan in a public forum:

Where we have tested for endorsement of religion, the subject of the test was either expression *by the government itself,* or else government action alleged to *discriminate in favor* of private religious expression or activity. The test petitioners propose, which would attribute to a neutrally behaving government *private* religious expression, has no antecedent in our jurisprudence, and would better be called a "transferred endorsement" test.

515 U.S. 753, 764 (1995) (internal citations omitted) (emphasis in original).[7]

In view of the foregoing, this Court has not surprisingly concluded, based on the cited caselaw, that the relevant inquiry in determining whether a religious display violates the Establishment Clause is whether a reasonable observer would perceive the display as a government endorsement of religion:

---

7. In *Capitol Square,* Justice Scalia announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and III, which Chief Justice Rehnquist and Justices O'Connor, Kennedy, Souter, Thomas, and Breyer joined, and an opinion with respect to Part IV, which Chief Justice Rehnquist and Justices Kennedy and Thomas joined. Justice Thomas filed a concurring opinion. Justice O'Connor filed an opinion concurring in part and concurring in the judgment, which Justices Souter and Breyer joined. Justice Souter filed an opinion concurring in part and concurring in the judgment, which Justices O'Connor and Breyer joined. Justices Stevens and Ginsburg filed dissenting opinions.

> Recent Supreme Court decisions . . . have not applied the *Lemon* test. Instead, in cases involving Establishment Clause challenges to private individuals' use of government resources, the Court has applied the endorsement test developed by Justice O'Connor, which dispenses with the "entanglement" prong of the *Lemon* test and collapses its "purpose" and "effect" prongs into a single inquiry: would a reasonable, informed observer, *i.e.*, one familiar with the history and context of private individuals' access to the public money or property at issue, perceive the challenged government action as endorsing religion?

*Tenafly Eruv Assoc., Inc. v. Borough of Tenafly*, 309 F.3d 144, 174 (3d Cir. 2002).[8]

Under the "endorsement" approach, the knowledge attributed to the "reasonable observer" becomes critical. Justice O'Connor describes her view (contrasting it with the differing view of Justice Stevens):

> In my view, proper application of the endorsement test requires that the reasonable observer be deemed more informed than the casual passerby postulated by Justice Stevens.
>
> . . .
>
> I therefore disagree that the endorsement test should focus on the actual perception of individual observers, who naturally have differing degrees of knowledge. Under such an approach, a religious display is necessarily precluded so long as some passersby would perceive a governmental endorsement thereof. In my view, however, the endorsement test creates a more collective standard to gauge "the 'objective' meaning of the [government's] statement in the community." In this respect, the applicable observer is similar to the "reasonable person" in tort law, who "is not to be identified with any ordinary individual, who might occasionally do unreasonable things," but is "rather a

---

8. In *Agostini v. Felton*, a school funding case, the Supreme Court held that the "entanglement" prong of *Lemon* was "an aspect of the inquiry into [the] effect." 521 U.S. 203, 233 (1997).

personification of a community ideal of reasonable behavior, determined by the [collective] social judgment." Thus, "we do not ask whether there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person *might* think [the State] endorses religion."

. . .

It is for this reason that the reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears. As I explained in *Allegheny*, "the 'history and ubiquity' of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion." Nor can the knowledge attributed to the reasonable observer be limited to the information gleaned simply from viewing the challenged display. . . . In my view, our hypothetical observer also should know the general history of the place in which the cross is displayed. Indeed, the fact that Capitol Square is a public park that has been used over time by private speakers of various types is as much a part of the display's context as its proximity to the Ohio Statehouse. This approach does not require us to assume an "'ultrareasonable observer' who understands the vagaries of this Court's First Amendment jurisprudence." An informed member of the community will know how the public space in question has been used in the past — and it is that fact, not that the space may meet the legal definition of a public forum, which is relevant to the endorsement inquiry.

*Capitol Square*, 515 U.S. at 779-781 (O'Connor, J., concurring in part and concurring in the judgment) (internal citations omitted).

This Court has adopted Justice O'Connor's view that a reasonable observer must be presumed to have an understanding of the general history of the display and the

community in which it is displayed; the reasonable observer is more knowledgeable than the uninformed passerby. In *ACLU of New Jersey v. Black Horse Pike Regional Board of Education*, we held that " 'the "history and ubiquity" of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion.' " 84 F.3d 1471, 1486 (3d Cir. 1996) (quoting *Allegheny*, 492 U.S. at 630 (O'Connor, J., concurring)). And in *ACLU v. Schundler*, 168 F.3d 92, 107 (3d Cir. 1999), we cited favorably Justice O'Connor's concurrence in *Capitol Square*, set forth *supra*, and held that "in evaluating the message conveyed by the modified . . . display to a reasonable observer, the general scope of [the city's] practice regarding diverse cultural displays and celebrations should be considered." *See also Tenafly*, 309 F.3d at 174 (asking whether "a reasonable, informed observer, *i.e.*, one familiar with the history and context of private individuals' access to the public money or property at issue, [would] perceive the challenged government action as endorsing religion?").

Thus, when evaluating whether the Ten Commandments plaque is an endorsement of religion by the County, we ask whether the plaque "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Capitol Square*, 515 U.S. at 773 (O'Connor, J., concurring in part and concurring in the judgment (citing *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring), and *Allegheny*, 492 U.S. at 628 (O'Connor, J., concurring)).[9] In

---

9. The County argues that if we do not reverse the decision of the District Court, we should at least remand because the District Court did not apply the "endorsement" test when evaluating the Ten Commandments plaque; instead, the County maintains, the District Court applied the *Lemon* test mechanically, inquiring into the purpose and effect of the display. However, because "we may affirm a correct decision of the district court on grounds other than those relied upon by the district court," *Central Pennsylvania Teamsters Pensions Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1107 (3d Cir. 1996) (citing *University of Maryland v. Peat Marwick Main & Co.*, 923 F.2d 265, 275 (3d Cir. 1991)), we will simply consider whether the outcome was correct (using the framework laid out in the text) and not whether the District Court employed the wrong framework.

so doing, we will assume that the reasonable observer is informed about the approximate age of the plaque and the fact that the County has done nothing with the plaque since it was erected; we also conclude that the reasonable observer is aware of the general history of Chester County. We address (and reject) in the margin Chester County's argument that we should afford a presumption of constitutionality for historic monuments and artifacts.[10]

---

10. Chester County maintains that this is a case of first impression based on the fact that neither the Supreme Court nor this Court has dealt with an Establishment Clause case involving an historic religious display. The County notes that the cases in which the "endorsement" test has been invoked involve recent displays (generally temporary holiday displays). The County then suggests that we should afford a presumption of constitutionality for historic monuments and artifacts; under the County's test, an historic artifact (like the Ten Commandments plaque here) would violate the Establishment Clause only if there was no secular purpose for erecting the plaque, or if the display is accompanied by impermissible current government conduct. If we decline to adopt such a presumption, the County maintains, courts following this opinion will be forced to purge many longstanding religious references.

However, we are not persuaded by this "slippery slope" argument. Indeed, Justice O'Connor in *Allegheny* responded to a similar criticism of her "endorsement" test raised by Justice Kennedy:

Justice Kennedy submits that the endorsement test is inconsistent with our precedents and traditions because, in his words, if it were "applied without artificial exceptions for historical practice," it would invalidate many traditional practices recognizing the role of religion in our society. This criticism shortchanges both the endorsement test itself and my explanation of the reason why certain longstanding government acknowledgments of religion do not, under that test, convey a message of endorsement. Practices such as legislative prayers or opening Court sessions with "God save the United States and this honorable Court" serve the secular purposes of "solemnizing public occasions" and "expressing confidence in the future." These examples of ceremonial deism do not survive Establishment Clause scrutiny simply by virtue of their historical longevity alone. Historical acceptance of a practice does not in itself validate that practice under the Establishment Clause if the practice violates the values protected by that Clause, just as historical acceptance of racial or gender based discrimination does not immunize such practices from scrutiny under the Fourteenth Amendment.

Under the "endorsement" approach, we do not consider the County's purpose in determining whether a religious display has violated the Establishment Clause; instead, we focus on the *effect* of the display on the reasonable observer, inquiring whether the reasonable observer would perceive it as an endorsement of religion. However, in view of the possibility that a higher court may prefer to analyze the constitutionality of this plaque under the traditional *Lemon* purpose and effect inquiry, we will now briefly consider how to evaluate the County's purpose. *See Edwards v. Aguillard*, 482 U.S. 578, 585 (1987) (" 'The purpose prong of the Lemon test asks whether government's actual purpose is to endorse or disapprove of religion.' " (quoting *Lynch*, 465 U.S. at 690) (O'Connor, J.,

---

. . .

Under the endorsement test, the "history and ubiquity" of a practice is relevant not because it creates an "artificial exception" from that test. On the contrary, the "history and ubiquity" of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion.

. . .

The question under endorsement analysis, in short, is whether a reasonable observer would view such longstanding practices as a disapproval of his or her particular religious choices, in light of the fact that they serve a secular purpose rather than a sectarian one and have largely lost their religious significance over time.

492 U.S. at 630-631 (O'Connor, J., concurring).

Likewise, we conclude that by considering the history of a religious display as part of the context in which the reasonable observer views the display, we will ensure that courts following this opinion will not be forced to hold that benign and longstanding religious references are unconstitutional; instead courts should examine the age and relevant history surrounding the use of the display as part of the context in which the reasonable observer views it. At the same time, by stressing that history is only part of the context of a display, and not giving a presumption of constitutionality to historic artifacts or monuments, we ensure that displays that *do* have the effect of endorsing religion are not held to be constitutional simply because of their age.

concurring)). We also believe that this is a prudent approach considering the fact that other Courts of Appeals presented with similar issues have applied the *Lemon* test, and considered the purpose as well as the effect of the display. *See, e.g., King v. Richmond County*, 2003 U.S. App. LEXIS 10943 (11th Cir. 2003); *Adland v. Russ*, 307 F.3d 471 (6th Cir. 2002), *cert. denied*, 71 U.S.L.W. 3568 and 71 U.S.L.W. 3678 (U.S. April 28, 2003) (No. 02-1241); *Books v. City of Elkhart*, 235 F.3d 292 (7th Cir. 2000), *cert. denied*, 532 U.S. 1058 (2001).

In our view, any inquiry into the County's purpose would require consideration not only of the County's original purpose for displaying the plaque in 1920, but also of the Commissioners' purpose for leaving the plaque in place in 2001, when Flynn requested that it be removed. There is support for this view in other Courts of Appeals. *See, e.g., Books*, 235 F.3d at 302 (holding that although the monument's purpose was not secular, "[i]n determining whether this particular display of the Ten Commandments can be said to have a secular purpose, we must evaluate the totality of the circumstances surrounding the placement *and maintenance of the monument.*") (emphasis added).

Since the purpose prong of *Lemon* only requires some secular purpose, and not "that the purposes of the display are 'exclusively secular,' " *Lynch*, 465 U.S. at 681 n. 6, we conclude that the articulation of a legitimate secular purpose for declining to remove the plaque in 2001 would satisfy the first prong of *Lemon*, the requirement that there be a secular purpose for the display. *See also Edwards*, 482 U.S. at 586-87 (noting that courts "normally defer[ ]" to "articulation of a secular purpose" that is "sincere and not a sham"). Although the County's original purpose for affixing the plaque to the facade of the Courthouse would certainly inform the determination of whether the stated purpose for leaving it in place was a sham, we conclude that the primary focus should be on the events of 2001, when the County refused Flynn's request. This is consistent with our view of the "endorsement" test, in which we also focus on the events of 2001; we presume that the reasonable observer views the plaque in or around 2001

and is aware of the age and history of the plaque and the fact that the County has done nothing to celebrate or highlight it. It would not make sense for us to focus on the present day effect of the plaque, and yet only consider the original purpose for erecting the Ten Commandments plaque.

## III. Application of the Tests

### A. The "Endorsement" Test

We now turn to the question whether a reasonable observer, aware of the history of the plaque, would view it as an endorsement of religion by the County. As a preliminary matter, we cannot ignore the inherently religious message of the Ten Commandments. Indeed, the Supreme Court acknowledged this explicitly in *Stone v. Graham*, a case involving a Kentucky statute which required the posting of a copy of the Ten Commandments on the walls of every public school classroom:

> The pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact.

449 U.S. 39, 41 (1980). However, we do not believe that *Stone* holds that there can never be a secular purpose for posting the Ten Commandments, or that the Ten Commandments are so overwhelmingly religious in nature that they will always be seen only as an endorsement of religion; rather, we conclude that *Stone* is fairly limited to its facts. *Stone* held that a statute, recently enacted, requiring the posting of the Ten Commandments in school classrooms is an endorsement of religion by the state, considering the inherently religious nature of the Ten Commandments. But as the Court itself observed in *Edwards*, "in *Stone* [our] decision forbidding the posting of the Ten Commandments did not mean that no use could ever be made of the Ten Commandments, or that the Ten

Commandments played an exclusively religious role in the history of Western Civilization." 482 U.S. at 594.

While the Ten Commandments are undeniably religious, the Supreme Court has held that the context of an otherwise religious display can render the message of the overall display as not endorsing religion. In *Lynch*, the Court concluded that while the display of a crèche was religious, when viewed in the context of the entire display (which included less religious items associated with Christmas, such as Santa Claus and candy-striped poles, and completely secular objects, such a clown and a teddy bear) it sent the message that the city was simply acknowledging religion and not endorsing it. 465 U.S. at 692 (O'Connor, J., concurring) ("Although the religious and indeed sectarian significance of the crèche . . . is not neutralized by the setting, the overall holiday setting changes what viewers may fairly understand to be the purpose of the display."). In contrast, the Supreme Court concluded in *Allegheny* that a crèche displayed by itself in a county courthouse, with no surrounding secular objects to change the message sent to the reasonable observer, was an unconstitutional endorsement of religion. 492 U.S. at 598 ("There is no doubt, of course, that the crèche itself is capable of communicating a religious message. . . . Under the Court's holding in *Lynch,* the effect of a crèche display turns on its setting. Here, unlike in *Lynch,* nothing in the context of the display detracts from the crèche's religious message.").

We find further support for the notion that context can change the reasonable observer's perception of an otherwise religious display (indeed a depiction of the Ten Commandments) in a recent case decided by the Court of Appeals for the Eleventh Circuit, *King v. Richmond County*, 2003 U.S. App. LEXIS 10943 (11th Cir. 2003). The *King* case involved the use of an official seal for more than 130 years by the Superior Court of Richmond County, Georgia, depicting two rectangular tablets with rounded tops meant to represent the Ten Commandments. The Court concluded that the seal did not send a message of endorsement of religion because of four factors contributing to its context: (1) the seal serves the distinct secular purpose of

authenticating legal documents; (2) the presence of a sword intertwined with the tablets increases the probability that the reasonable observer will view the tablets as a symbol of secular law rather than as a religious symbol; (3) the seal is relatively small and discreet; and (4) because the seal does not contain the actual text of the Ten Commandments (but the tablets do contain the Roman numerals I through X), the reasonable observer is not induced to read or venerate sacred text. Notwithstanding our comments in the margin, we acknowledge that the *King* case involved a different set of facts. It is nonetheless significant that another Court of Appeals has concluded that a depiction of the Ten Commandments can pass constitutional muster when the context of its display causes the reasonable observer to view it not as an endorsement of religion, but as serving a secular purpose.[11]

While the Ten Commandments plaque here is displayed

---

11. We note that the fact that the *King* panel held that the seal authenticates legal documents supports our discussion of ceremonial deism, such as "In God We Trust," and "God save the United States and this Honorable Court." *See* discussion *infra* in text. History provides a context which changes how the reasonable observer views a religious phrase or symbol because over time, these phrases (and the seal) have taken on a secular purpose; in the *King* case, the seal served the secular purpose of identifying documents as authentic (however, it is also arguable that by placing the seal on legal documents, the county is reinforcing the link between church and state). We also note that, like the seal, the plaque is somewhat discreet. The *King* panel found significant "the size and placement" of the seal "near the bottom or on the last page of legal documents" because the reasonable observer would be less inclined to believe that the government was endorsing religion. *King*, slip op. at 29. Here, the entrance near the plaque is now closed and only the title "The Commandments" is legible from the sidewalk in front of the courthouse. Thus, we think that the reasoning in *King* supports our position.

We are not impressed by the argument that the presence of the sword increases the likelihood that the reasonable observer would focus on the secular significance of the Ten Commandments and not their religious meaning. As such, we do not believe that our case is weakened by the absence of any similar secular symbols along with the plaque; the sword no more suggests the secular purpose of the Ten Commandments than the "no-smoking" sign next to the plaque here.

by itself (we do not believe that the surrounding administrative plaques change the effect on the reasonable observer), the *age and history* of the plaque provide a context which changes the effect of an otherwise religious plaque. *See Allegheny*, 492 U.S. at 630 (O'Connor, J., concurring) ("[T]he 'history and ubiquity' of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion."). So the question is, would a passerby (generally knowledgeable about the history of the plaque and Chester County) who walked up the steps to read the text of the Ten Commandments plaque reasonably believe that by declining to remove the 82-year-old plaque, the County was endorsing religion?

Turning in more detail to the notion of history as context, Justice O'Connor in *Allegheny* suggests that history provides a context which can change the effect of a religious display because the reasonable observer would understand that the display has "largely lost [its] religious significance over time," 492 U.S. at 631, and taken on "secular purpose[s]." *Id.* Of course, we agree that her examples of "ceremonial deism" are not violations of the Establishment Clause, *e.g.*, the opening of court with the introduction "God save the United States and this Honorable Court" (used in this very Court), or the inscription "In God We Trust" on U.S. coins. But we do not think this is so because the phrases themselves have lost their religious significance. Indeed, it is hard to imagine that these two phrases invoking God would not be perceived as religious. Yet, in context, the phrase "In God We Trust" has taken on a secular meaning that changes the effect on the reasonable viewer; it is a cultural tradition and a well-known marker identifying money as authentic. Similarly, over time, the opening words "God save the United States and this Honorable Court" have taken on the secular purpose of "solemnizing public occasions" and "expressing confidence in the future." *Id.* Thus, the reasonable observer, aware of the history of these invocations of God, views the religious language as tempered by the secular meaning that has emerged over the passage of time; the overall effect is that the reasonable

person would not perceive in these phrases a government endorsement of religion (despite the clear use of the word "God").

The language of the Ten Commandments is certainly different from "In God We Trust" or other examples of ceremonial deism; the Ten Commandments are sacred text, words taken directly from the Bible. In contrast, phrases such as "In God We Trust" and "God save the United States and this Honorable Court" are non-sectarian and would not be used as prayer themselves. We note this distinction because the case has yet to be made that the Ten Commandments themselves have lost their primary religious significance or that they have taken on a primarily secular purpose. Instead, as we now explain in more detail, we think that this particular plaque displaying the Ten Commandments (in contrast to the Ten Commandments in the abstract) would not be perceived by the reasonable observer as an endorsement of religion when viewed in the context of its own history.

As noted above, a reasonable observer of the Ten Commandments plaque is presumed to be aware of the history of the plaque. While the reasonable observer may not know the exact date that the plaque was erected, the reasonable observer must certainly be presumed to know that the plaque has been affixed to the Courthouse for a long time. (Indeed, Flynn was aware from her own experience that the plaque had been a fixture in Chester County for at least 40 years before she complained about it.). As a result, while the reasonable observer may perceive the Ten Commandments (in the abstract) as portraying a religious message, he or she would view the *plaque* as a reminder of past events in Chester County. Thus, history provides a context which changes how the reasonable observer would regard the plaque.

The reasonable observer would perceive an historic plaque as less of an endorsement of religion than a more recent religious display *not* because the Ten Commandments have lost their religious significance, but because the maintenance of this plaque sends a much different message about the religious views of the County than would a recently erected display of the Ten

Commandments. The reasonable observer, knowing the age of the Ten Commandments plaque, would regard the decision to leave it in place as motivated, in significant part, by the desire to preserve a longstanding plaque. In contrast, a contemporary decision to erect such a plaque could not be motivated by historic preservation; rather it would appear much more likely that the County Commissioners were motivated by religion. As such, a new display of the Ten Commandments is much more likely to be perceived as an endorsement of religion by the County (especially where there is nothing else in the context of the display that would change the views of the reasonable observer, such as exists in the frieze in the courtroom of the United States Supreme Court, which portrays Moses carrying the Ten Commandments alongside depictions of other figures who have impacted modern law, such as John Marshall, William Blackstone, and Caesar Augustus). *See Allegheny*, 492 U.S. at 652-53 (Stevens, J., concurring in part and dissenting in part).

The issue is perhaps best framed by *Marsh v. Chambers*, where the Supreme Court held that the Nebraska Legislature's practice of opening each legislative day with a prayer by a chaplain paid by the state did not violate the Establishment Clause. Chief Justice Burger explained:

> We do not doubt the sincerity of those, who like respondent, believe that to have prayer in this context risks the beginning of the establishment the Founding Fathers feared. But this concern is not well founded, for as Justice Goldberg aptly observed in his concurring opinion in *Abington*, 374 U.S. at 308 [*Abington School District v. Schempp*, 374 U.S. 203 (1963)]:
>
>> "It is of course true that great consequences can grow from small beginnings, but *the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow.*"
>
> The unbroken practice for two centuries in the National Congress and for more than a century in Nebraska and in many other states gives abundant assurance that there is no real threat "while this Court sits."

463 U.S. 783, 795 (quoting *Panhandle Oil Co. v. Mississippi ex rel. Knox*, 277 U.S. 218, 223 (1928) (Holmes, J., dissenting)) (emphasis added).

While the *Marsh* Court found it significant that the use of legislative prayer was contemporaneous with the drafting of the Establishment Clause, noting that "three days after Congress authorized the appointment of paid chaplains, final agreement was reached on the language of the Bill of Rights," 463 U.S. at 788, it is nonetheless significant that the Supreme Court has acknowledged the proposition that history can transform the effect of a religious practice.

For the reasons stated above, and in the prescient words of Justice Goldberg, we believe the plaque, when viewed in the context of its history, is not "real threat," but is instead "mere shadow." The fact that the plaque is a longstanding fixture on an historic monument, the Courthouse itself (which has been placed on the National Register of Historic Places), lends further support for the notion that the context of the plaque changes the way in which the reasonable observer views it. As counsel for amicus Chester County Historic Preservation Network reasoned at oral argument, over time, additions to historic monuments can become part of the historic monuments themselves. While the preservationist perspective would not militate in favor of affixing the Ten Commandments plaque to this historic Courthouse today, it opposes tearing down this plaque because it has become part of the history of the Chester County Courthouse, a monument significant to Chester County. A reasonable observer must be presumed to know the history of the Courthouse (a marker noting the historic nature of the Courthouse is actually affixed to the same east facade to which the Ten Commandments plaque is affixed) and the fact that the plaque itself has become part of this historic Courthouse. Thus, the reasonable observer would perceive the plaque as a part of an historic monument, namely the Courthouse itself. Viewed in this context, the Commissioners' refusal to remove the plaque appears even less like an endorsement of religion and more likely motivated by the desire to preserve a plaque that has become part of the Courthouse.

While the history of the plaque changes its effect, history by itself may not be sufficient to change an otherwise religious display into something that is not perceived by the reasonable observer as an endorsement of religion. *Allegheny*, 492 U.S. at 630 (O'Connor, J., concurring) ("Historical acceptance of a practice does not in itself validate that practice under the Establishment Clause if the practice violates the values protected by that Clause."). In the case at bar, however, it is highly significant that there is no evidence that the County has taken any action involving the plaque since it was erected over 80 years ago. We presume that the reasonable observer knows that the County has not held a ceremony to commemorate the anniversary of the plaque or even installed lights to draw attention to the plaque at night. Indeed, the County has actually closed the old entrance near the plaque, which has detracted in a major way from the obviousness and accessibility of the plaque. Though the entrance was closed for "budgetary reasons and security reasons," the County could have moved the plaque to the new entrance if it wanted to call attention to the plaque. The fact that the County has not taken any action to highlight or celebrate the plaque since it was installed reinforces the view of the reasonable observer that the County Commissioners maintained the plaque to preserve a longstanding plaque.

## B. The Lemon Test (Purpose and Effect)

Turning to the *Lemon* test, we conclude that the County Commissioners had a legitimate secular purpose for refusing to remove the plaque which, as we noted above, is all that is required under the purpose prong of *Lemon.* Although Commissioners Hanna and Dinniman were never asked directly why they decided to leave the plaque in place, and the District Court focused on the County's original purpose for accepting the plaque, noting that "the views of the current officeholders are of little, if any, value," *Freethought Soc'y*, 191 F.Supp. 2d at 598, we nonetheless believe that the record is unequivocal that the Commissioners professed a "non-sham" secular purpose for refusing to remove the plaque. For example, Commissioner Hanna stated that he believed that the plaque symbolized

the " 'two wing theory of our polity,' in which faith and reason . . . as a historical reality worked together to create and maintain the American experiment." *Id.* at 597-98. He also stated that "I believe [the Ten Commandments] have both a secular purpose and a religious origin." Likewise, Commissioner Dinniman testified that "I think there's no doubt that there are a lot of traditions [contributing] to the development of our system of law. The Ten Commandments being one."

Based on this testimony, the District Court found that the Commissioners were responding honestly and truthfully about their perceptions of the plaque. Given the relatively low threshold required by the purpose prong of *Lemon* (the purpose of the display does not have to be exclusively secular and courts normally defer to the stated purpose of the display, *see Edwards*, 482 U.S. at 585-87), it would appear that the Commissioners' articulations are sufficient to demonstrate a legitimate secular purpose.

This conclusion is supported by some well documented history, presented by Chester County and its amici, to the effect that the Ten Commandments have an independent secular meaning in our society because they are regarded as a significant basis of American law and the American polity, including the prohibitions against murder and blasphemy. *See, e.g., Bertera's Hopewell Foodland, Inc. v. Masters*, 236 A.2d 197, 200-01 (Pa. 1967) (noting that the Sunday closing laws "trace[ ] an ancestry back to the Ten Commandments fulminated from the smoking top of Mt. Sinai. . . . This divine pronouncement became part of the Common Law inherited by the thirteen American colonies and by the sovereign States of the American union."); *Anderson v. Maddox*, 65 So.2d 299, 301-302 (Fla. 1953) (" 'Thou shalt not steal' and 'thou shalt not bear false witness' are just as new as they were when Moses brought them down from the Mountain.") (Terrell, J., concurring specially); *State v. Gamble Skogmo, Inc.*, 144 N.W.2d 749, 768 (N.D. 1966) ("Thus, for temporal purposes, murder is illegal. And the fact that this agrees with the dictates of the Judaeo-Christian religions while it may disagree with others does not invalidate the regulation. So too with the questions of adultery and polygamy. The same could be

said of theft, fraud., etc. because those offenses were also proscribed in the Decalogue.") (internal citations omitted).

It would also appear that the commandment against taking the Lord's name in vain is reflected in the practice of swearing to uphold the law with the phrase, "so help me God." *See also* Daniel J. Boorstin, *The Mysterious Science of the Law*, at preface to Beacon Press Edition (1958) (noting of Blackstone's *Commentaries on the Laws on England* that "[i]n the history of American institutions, no other book — except the Bible — has played so great a role. . ."); Blackstone identifies King Alfred as the founder of English common law and the Laws of King Alfred start with the Ten Commandments. Harold J. Berman, *Individualistic And Communitarian Theories of Justice: An Historical Approach*, 21 U. Cal. Davis L.Rev. 549-575 (1988).

Chester County also notes that members of the United States Supreme Court have recognized the influence of the Ten Commandments on the foundations of the American legal system. *See Stone*, 449 U.S. at 45 (Rehnquist, J., dissenting) ("It is . . . undeniable . . . that the Ten Commandments have had a significant impact on the development of secular legal codes of the Western World."); *McGowan v. Maryland*, 366 U.S. 420, 462 (1961) (Frankfurter, J., concurring) ("Innumerable civil regulations enforce conduct which harmonizes with religious canons. State prohibition of murder, theft and adultery reinforce commands of the decalogue."). Numerous American Presidents have also made reference to the Ten Commandments as a foundational legal document. *See, e.g.*, John Adams, 6 *The Works of John Adams, Second President of the United States* 9 (Charles Francis Adams, ed. 1851) ("If 'Thou shalt not covet' and 'Thou shalt not steal' were not commandments of Heaven, they must be made inviolable precepts in every society, before it can be civilized or made free."); Harry S. Truman, *Public Messages, Speeches and Statements by the President, Jan. 1. to Dec. 31, 1950* (Washington, D.C. U.S. Government Printing Office, 1965) Item 37, p. 157 ("The fundamental basis of this Nation's laws was given to Moses on the Mount.").

Returning briefly to the "endorsement" inquiry, we note that we did not consider whether the reasonable observer

(in contrast to the Commissioners) would believe that the Ten Commandments formed the basis of much of American law and polity, a conclusion which would have given additional support to our holding that the reasonable viewer would not perceive the plaque as an endorsement of religion. Instead, we discuss the Ten Commandments as a foundational legal document only to the extent that it informs our determination of the *subjective* inquiry into the Commissioners' purpose. Thus, in holding that the Commissioners had a legitimate secular purpose for refusing to remove the plaque (it appears that they honestly believed it served the secular purpose of demonstrating one of the key sources of American law), we express no opinion about the *objective* inquiry into whether a reasonable observer would perceive the Ten Commandments plaque as celebrating a foundational legal document, although we comment in the margin about this troubling and difficult question.[12]

---

12. The plaintiffs and the amici in support of the plaintiffs question the extent to which the laws of the United States are actually based upon the Ten Commandments (a question which we have neither the desire nor expertise to resolve). They also contend that the County's examples in no way suggest that the *reasonable observer* would believe that the Ten Commandments are the basis for many modern laws; indeed, the assumption, inherent in Chester County's argument, that the reasonable observer knows about, *e.g.,* statements made by John Adams or the holdings of state court cases seems highly questionable. Finally, the plaintiffs note that the Ten Commandments is not the *most* significant basis of American law and polity and that there is no reason why the reasonable observer would believe that the plaque was posted to celebrate the foundational significance of the decalogue and not its religious message, especially where other foundational documents (such as the Magna Carta or the Bill of Rights) are not displayed along with the Ten Commandments.

We acknowledge the intuitive force of the defendants' secularization arguments set forth in text, *i.e.,* that the Ten Commandments have lost their primary religious significance because of the perception that they are a significant source of American law and polity. We also acknowledge the great force of the plaintiffs' reasoning in opposition to these arguments both in their application and their doctrinal core. However, we need not address these issues since we decide this case on narrower grounds.

Since effect under the *Lemon* test is cognate to endorsement, we simply incorporate our discussion of endorsement in Part III. A *supra*, and given our conclusion as to the legitimacy of their purpose, hold that the Commissioners' refusal to remove the plaque passes constitutional muster under both the purpose and effect prongs of *Lemon*.

## IV.   Other Courts of Appeals

In Part III. A, we noted that the Court of Appeals for the Eleventh Circuit recently upheld the use of an official seal depicting the Ten Commandments. *King v. Richmond County*, No. 02-14146 (11th Cir. May 30, 2003). While the Court did not discuss whether the seal's history (it had been used for over 130 years) could change what the reasonable observer believed to be the purpose of the tablets on the seal, instead focusing on factors such as the absence of the text of the Ten Commandments, we nonetheless find support in this opinion for our holding that context can change how a display of the Ten Commandments is perceived by the reasonable observer.

However, we also acknowledge that two other Courts of Appeals have recently considered private displays of the Ten Commandments on government property and concluded that those displays violated the Establishment Clause.[13] We find these cases neither apposite nor persuasive. In *Adland v. Russ*, 307 F.3d 471 (6th Cir. 2002), *cert. denied*, 71 U.S.L.W. 3568 and 71 U.S.L.W. 3678 (U.S. April 28, 2003) (No. 02-1241), the Court of Appeals for the Sixth Circuit held that a monument displaying a "nonsectarian" version of the Ten

---

13. The Court of Appeals for the Tenth Circuit, however, concluded that a display of the Ten Commandments did not violate the Establishment Clause in *Anderson v. Salt Lake City Corp.*, 475 F.2d 29 (10th Cir. 1973). We do not find much support for our decision in that case since it was decided prior to the Supreme Court's discussion of the Ten Commandments in *Stone v. Graham*, 449 U.S. 39 (1980), and the display cases from which the "endorsement" test emerged. *See, e.g., Lynch v. Donnelly*, 465 U.S. 668 (1984); *County of Allegheny v. ACLU*, 492 U.S. 573 (1989); *Capitol Square Review Bd. v. Pinette*, 515 U.S. 753 (1995).

Commandments (compiled by representatives of Judaism, Protestantism and Catholicism) donated by the Fraternal Order of Eagles in 1971, but moved to storage in 1980, could not be placed on the state capitol grounds after a 2000 state resolution to take the monument out of storage. That case of course involved a proposed placement of the Ten Commandments, not the refusal to remove a longstanding plaque. Moreover, the monument there was not as old and was much more prominent than the plaque at issue here. In *Books v. City of Elkhart*, 235 F.3d 292 (7th Cir. 2000), *cert. denied*, 532 U.S. 1058 (2001), the Court of Appeals for the Seventh Circuit, over a powerful dissent by Judge Manion, concluded that a monument similar to the one in *Adland*, displaying a "nonsectarian" version of the Ten Commandments, donated by the Fraternal Order of Eagles in 1958 and displayed on the lawn in front of a local municipal building (a much more prominent placement than is involved here), had the purpose and effect of endorsing religion. *See also Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766 (7th Cir. 2001), *cert. denied*, 534 U.S. 1162 (2002) (following *Books* and holding that the state's acceptance of a monument containing the Ten Commandments which would have been placed in a prominent position on the Indiana Statehouse grounds to replace a monument donated by the Fraternal Order of Eagles in 1958 and destroyed in 1991 by a vandal would violate the Establishment Clause). We are, of course, not bound by these cases and we do not believe that either is particularly instructive in the case at bar. Neither court addressed the argument that history could provide a context which could change the effect of the overall display on a reasonable observer.

## V.   Conclusion

For all the foregoing reasons we believe, in Justice Goldberg's words, that the Ten Commandments plaque affixed to the Chester County Courthouse in 1920 is today not "real threat," but "mere shadow." *Marsh*, 463 U.S. at 795. The order of the District Court will be reversed and the permanent injunction prohibiting the continued display of the plaque will be vacated.

BRIGHT, Circuit Judge, concurring.

I concur in Judge Becker's excellent opinion but for emphasis make a separate statement.

A world of difference exists between the conduct of the Chester County officials approving the placement of the plaque at the then main entrance to the Chester County Courthouse eighty-three years ago and the decision of Chester County not to remove the plaque as of today.

In my view, several crucial facts support our decision today and give rise to a unique situation unlike any prior case. First, when the Courthouse opened its new entrance in 2001 for security and cost concerns, Chester County and the Commissioners did not change the location of the plaque. Moreover, in the many years the plaque has hung on the Courthouse, the County has never taken any action to commemorate, celebrate, or highlight it. With the closing of the former entrance, the plaque is barely visible from the street, and its text is mostly obscured. These facts can hardly be construed as Chester County's endorsement of religion. In not changing the location of the plaque to the main entrance or otherwise actively drawing attention to the plaque, Chester County and its Commissioners' conduct indicates neutrality toward the plaque and its text.

I agree with the majority that we cannot read *Stone v. Graham*, 449 U.S. 39 (1980), as requiring that any government posting of the Ten Commandments be construed as an endorsement of religion. Nonetheless, we must be mindful of the Supreme Court's recognition that the decalogue is "undeniably a sacred text in the Jewish and Christian faiths." 449 U.S. at 41. In negotiating the often treacherous path of Establishment Clause jurisprudence, I also turn to Justice Goldberg's concurrence in *School Dist. of Abington Township v. Schempp*:

> The fullest realization of true religious liberty requires that government neither engage in nor compel religious practices, that it effect no favoritism among sects or between religion and nonreligion, and that it work deterrence of no religious belief. But devotion even to these simply stated objectives presents no easy

course, for the unavoidable accommodations necessary to achieve the maximum enjoyment of each and all of them are often difficult of discernment. There is for me no simple and clear measure which by precise application can readily and invariably demark the permissible from the impermissible.

It is said, and I agree, that the attitude of government toward religion must be one of neutrality. But untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands, but of a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious. Such results are not only not compelled by the Constitution, but, it seems to me, are prohibited by it.

374 U.S. 203, 305-06 (1963) (Goldberg, J., concurring).

This case presents a scenario entirely distinct from the cases in which government officials make a *contemporaneous* decision about a Ten Commandments display. *See, e.g., Adland v. Russ*, 307 F.3d 471, 480 (6th Cir. 2002); *Books v. City of Elkhart*, 235 F.3d 292, 304 (7th Cir. 2000).



Pic00028





DEFENDANT'S EXHIBIT 29 A575

exte006



DEFENDANT'S
EXHIBIT
43          A589

A True Copy:
        Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*